STATE of Missouri, Respondent,

v.

Walter BARTON, Appellant.

No. 80931.

Supreme Court of Missouri,
En Banc.

Aug. 3, 1999.

Rehearing Denied Sept. 7, 1999.

J. Christopher Spangler, Special Public Defender, Sedalia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Gregory L. Barnes, Assistant Attorney General, Jefferson City, for Respondent.

ANN K. COVINGTON, Judge.

Appellant, Walter E. Barton, was convicted of the class A felony of murder in the first degree, in violation of 565.020, RSMo 1994, for which he was sentenced to death. Appellant appeals his first degree murder conviction and his sentence. Affirmed.[1]

The evidence is viewed in the light most favorable to the verdict. *State v. Kreutzer*, 928 S.W.2d 854, 859 (Mo. banc 1996). On the morning of October 9, 1991, Carol Horton, a resident of Riverview Mobile Home Park in Ozark, Missouri, visited the trailer of Gladys Kuehler at approximately 9:00 a.m. Kuehler, eighty-one years of age, served as manager of the park. Kuehler was unable to move about without the assistance of a cane. Horton assisted

Kuehler with some tasks and last saw Kuehler at 11:04 a.m.

The owners of the trailer park, Bill and Dorothy Pickering, visited Kuehler's trailer some time between 1:15 p.m. and 2:00 p.m. to collect rent receipts. Ted and Sharon Bartlett, former residents of the trailer park, arrived for a visit with Kuehler between 2:00 p.m. and 2:15 p.m. and remained until about 2:45 p.m. Kuehler told the Bartletts that she was going to lie down because she was not feeling well.

Appellant was visiting Horton in her trailer on October 9, 1991. At approximately 2:00 p.m., appellant left her trailer. Appellant said that he was going to Kuehler's trailer to borrow twenty dollars. He returned to Horton's trailer ten or fifteen minutes later saying that Kuehler told him to return later and that she would write him a check. Appellant left Horton's trailer again at approximately 3:00 p.m. He told Horton that he was going to Kuehler's trailer.

At approximately 3:15 p.m., Bill Pickering telephoned Kuehler's trailer. A man, later determined to be appellant, answered the telephone and stated that Kuehler was in the bathroom and could not come to the telephone. Debra Selvidge, Kuehler's granddaughter, spoke with Kuehler on the telephone some time after 3:00 p.m. She telephoned Kuehler again between 3:30 p.m. and 4:00 p.m., but received no answer.

Appellant returned to Horton's trailer at approximately 4:00 p.m. Appellant was acting "totally different," seemed to be in a hurry, and asked Horton if he could use her restroom. Horton detected a smell of blood on Barton's person. After noticing that appellant had been in the bathroom for a long time, Horton went to check on him. Appellant was washing his hands. He said that he had been working on a car.

At approximately 4:15 p.m., Horton told appellant that she was going to Kuehler's

---

1. A history of this case is set forth in *State v. Barton*, 936 S.W.2d 781, 782 (Mo. banc 1996).

trailer. Appellant told her not to go because Kuehler had told him she was going to lie down and take a nap. Appellant left Horton's trailer. Horton then went to check on Kuehler. She received no response when she knocked on Kuehler's door. She tried to open the door, but it was locked. She returned to Kuehler's trailer again at 6:00 p.m. and again received no response.

Debra Selvidge, who had been attempting to reach Kuehler by telephone, drove to Kuehler's trailer. She knocked on the door but received no answer. At approximately 7:30 p.m., Selvidge went to Horton's trailer and expressed her concern. Horton, Horton's son, and Selvidge went to Kuehler's trailer. They knocked and received no response. On their way to make telephone calls, they saw a police officer, Officer Hodges, who agreed to meet them at Kuehler's trailer after he answered another call. The two women saw appellant at another trailer in the trailer park. Selvidge asked him if he would go with them back to Kuehler's trailer. Appellant agreed to go but said that he would go later.

The women drove to Kuehler's trailer. After a time, appellant arrived. The women knocked on Kuehler's door. Appellant walked over to the side of the trailer, where he began to pound on the wall of the trailer under the bedroom window near where Kuehler's body was later found.

Officer Hodges arrived and unsuccessfully attempted to open the door. He radioed a dispatcher to send a locksmith. The officer left on another call. When the locksmith arrived, he opened the door. After the locksmith opened the door, Selvidge and Horton, followed by appellant, entered the trailer. After calling out for Kuehler and receiving no answer, Selvidge started down the hallway toward Kuehler's bedroom, followed by Horton and appellant. Appellant told Selvidge not to go down the hall. Selvidge did, however, and noticed Kuehler's clothing on the floor in

front of the toilet in the bathroom. Selvidge also noticed that the lid of the toilet had been left up. Selvidge discovered Kuehler's body in the bedroom. Kuehler's partially nude body lay on the floor between the bed and the wall; there was a large amount of dried blood on the bed and the floor. Officer Hodges returned to Kuehler's trailer. Selvidge directed him to Kuehler's bedroom where he saw her body between the bed and the wall.

Appellant did not appear to be surprised at the time the body was discovered and showed no emotion whatsoever. Officer Hodges asked appellant when he had last seen Kuehler. Appellant said that he had last seen Kuehler at her trailer between 2:00 p.m. and 2:30 p.m. He had gone there to borrow money. Kuehler had agreed to lend him some money, but could not write the check at that time because she did not feel well and was going to take a nap. Appellant said that he had returned later, but Kuehler did not answer the door. Appellant said that he had never received the check.

Sergeant Jack Merritt of the Missouri Highway Patrol assisted with the investigation. He discovered at the scene a pocketbook and checkbook on a vanity across from Kuehler's bed. Although check number 6027 was missing from the checkbook, there was no entry in the check register for that check. All other checks written prior to that appeared to have been entered in the check register. The first remaining check in the checkbook was number 6028.

Sergeant Merritt was aware that Bill Pickering had telephoned Kuehler's trailer at 3:15 p.m. and that a man had answered at that time. Merritt asked appellant what time he answered the telephone in the trailer. Appellant admitted to having answered Pickering's call. Sergeant Merritt then asked appellant to go to the sheriff's department, and appellant agreed. Upon arrival, Sergeant Merritt advised appellant of his *Miranda* rights.

While Sergeant Merritt fingerprinted appellant, Officer Hodges noticed what appeared to be a bloodstain on the elbow of appellant's shirt and what appeared to be a bloody handprint on the shoulder of his shirt. The officers later noticed some blood on appellant's jeans. Officer Hodges recalled that he might have noticed some blood on appellant's boots. Officer Hodges asked appellant how the blood got on his clothing. Appellant replied that he had pulled Selvidge away from her grandmother's body and must have gotten it then. Selvidge confirmed that appellant had reached around her, pulled her away from Kuehler's body, and taken her out of the bedroom. Selvidge did not, however, get close enough to the victim to get into the blood.

Forensic testing confirmed small amounts of human blood on appellant's boots and jeans in addition to the blood found on his shirt. The amount of human blood on the boot was insufficient to compare with known samples. The blood on appellant's jeans had been diluted so that there was an insufficient amount to make a comparison. The serologist was able, however, to make a comparison of the blood stains found on appellant's shirt. The blood found on appellant's shirt could have come from Kuehler but not from appellant. DNA analysis of the blood on appellant's shirt showed that only one person out of 5.5 billion persons would have similar blood characteristics.

The blood found on appellant's shirt was determined to be very tiny blood drops, "high velocity blood." The drops were caused by a blow, an impact applied to a wound or to a pool of blood. Simply coming into contact with something bloody would not have produced the very tiny spots of blood that were seen on appellant's shirt.

Dr. James Spindler, a pathologist, conducted the autopsy of Gladys Kuehler. Kuehler's shirt was saturated with blood. There were thirty-four cuts in the front and back of her shirt. Kuehler's brassiere had eleven cuts. Kuehler sustained five blunt-force injuries to her head, consistent with a heavy cylindrical object such as a baseball bat. Kuehler had been stabbed and slashed several times in the eye area. Her right eye had been slashed through, and she sustained a stab wound to her left eyelid. The right eye slash was inflicted before Kuehler's death. Kuehler sustained at least four stab/slash wounds to her neck, the most serious of which severed her jugular vein and cut down to the bone in the back of her neck. Because of the multiple stab wounds to the chest, Kuehler's left lung was deflated and she suffered extensive bleeding into the chest cavity. Dr. Spindler concluded that Kuehler's breasts were being held down while she was being stabbed in the chest. Four large, deep slashes had been cut into Kuehler's abdominal area, forming two X's. One of the X-wounds was so deep that Kuehler's intestines protruded from the wound. There were four defensive wounds to the back of Kuehler's hands and arms. Examination of Kuehler's genitalia revealed "a lot" of bruising and tears in the vaginal area. The injuries were not caused by a knife, but by some blunt instrument or a penis. There was an absence of sperm.

Dr. Spindler concluded that Kuehler died from a combination of blood loss, shock, and stab wounds to the throat and chest, with lung collapse and hemorrhage of the lung spaces being contributing factors.

A young woman picking up trash with her church group on October 12, 1991, found a check, number 6027, in the amount of fifty dollars written on Kuehler's account and made payable to appellant. In the opinion of a criminologist with the Missouri Highway Patrol, Kuehler wrote the check.

While being held in the Christian County Jail, appellant told his cellmate, Larry Arnold, that he killed an old lady by cutting her throat, stabbing her, and cutting

an "X" on her body. Appellant said that he had thrown the murder weapon into a river.

Ricky Ellis, an inmate housed two or three cells away from appellant in the Christian County Jail, overheard appellant say that he was going to have Arnold killed because appellant had discussed a murder with Arnold, and Arnold had talked about it.

Katherine Allen, a trustee in the Lawrence County jail, was incarcerated with appellant. During an argument with Allen appellant told Allen that "he would kill me like he did her." Craig Dorser, another inmate in the Lawrence County jail, testified that appellant stated that he was in jail for murdering an old lady. Appellant said that he stabbed her forty-seven times, getting blood on his face and clothing and shoes. Appellant said he licked the blood off his face and "liked it."

At the close of all the evidence and after the instructions and arguments of counsel, the jury found appellant guilty as charged. In the penalty phase, the state presented evidence of two prior assaults committed by appellant. In 1976, appellant was convicted of assault with intent to kill committed against a female convenience store clerk. Appellant was paroled in February of 1984. In March of that year, appellant attacked, beat, and choked another female convenience store clerk in West Plains. The clerk screamed, and appellant threatened to kill her if she was not quiet. The attack was interrupted and appellant fled. The clerk sustained a black eye, a swollen jaw, and neck injuries as a result of appellant's attack. Appellant was convicted of assault in the first degree. During the penalty phase, appellant presented the testimony of six witnesses on his behalf.

At the close of the penalty phase and after the instructions and arguments of counsel, the jury found the following statutory aggravating circumstances: that appellant was convicted of assault with intent to kill on August 16, 1976, in the Circuit Court of Laclede County; that appellant

was convicted of assault in the first degree on June 18, 1984, in the Circuit Court of Howell County; and that the murder of Gladys Kuehler involved depravity of mind and was outrageously and wantonly vile, horrible, and inhumane because appellant, while killing Gladys Kuehler or immediately thereafter, purposely mutilated or grossly disfigured her body by acts beyond that necessary to cause her death. The jury recommended a sentence of death.

On June 10, 1998, the court imposed sentence in accordance with the recommendation of the jury. Appellant brings this appeal from his conviction and sentence of death.

■ Appellant alleges that the trial court abused its discretion in denying his request during voir dire to ask the venire panel specific questions regarding pretrial publicity. Appellant does not allege that any of the persons who served on his jury held opinions that would have prevented them from impartially determining his guilt or innocence. Rather, appellant claims that he was denied the opportunity to determine what prejudices or biases these jurors might have as a result of the pretrial publicity because he was unable to determine the source of their information. Appellant further argues that the trial court's action amounts to a "sweeping limitation" on voir dire, which rises to the level of reversible error. Appellant claims that the trial court's actions denied him due process, a fair trial, and the right to an impartial jury. U.S. Const. Amends. 5, 6, and 14; Mo. Const. art. I, secs. 10 and 18(a).

Six days prior to the commencement of jury selection in appellant's case, the *Benton County Enterprise* newspaper in Warsaw, Missouri, published a front-page article about the appellant's case. The article noted that the victim was appellant's former landlord, that appellant had been evicted, that this was appellant's fourth trial, and that appellant had been convict-

ed and sentenced to death in 1994, but that this Court had reversed the conviction. In response to concerns about the effect of any pretrial publicity, the trial court asked the entire venire panel if they had heard, seen, or read anything from any source about the trial or about appellant. Sixty-four members of the venire panel stated that they had heard about the case. Appellant requested individual voir dire of the sixty-four venirepersons who had been exposed to pretrial publicity. The trial court determined that it would be more efficient to question the venirepersons in small groups. During small group questioning, several venirepersons volunteered the fact that their source of pretrial publicity was a newspaper article. Although the trial court allowed counsel to ask a large number of questions designed to reveal the presence of bias, prejudice, and impartiality as a consequence of pretrial publicity, the trial court did not permit counsel to ask the venirepersons to reveal the specific source(s) of their information about the case.

The law governing the determination of bias, prejudice, or impartiality within the venire is well settled. Control of voir dire is within the discretion of the trial judge; only abuse of discretion and likely injury justify reversal. *State v. Storey*, 901 S.W.2d 886, 894 (Mo. banc 1995). The trial court abuses its discretion only if the voir dire permitted does not allow for the discovery of bias, prejudice, or impartiality. *State v. Nicklasson*, 967 S.W.2d 596, 609 (Mo. banc 1998). The relevant question in determining whether a venireperson is biased is not whether there was publicity surrounding the crime or whether prospective jurors in a case remembered the publicity or the crime. *State v. Feltrop*, 803 S.W.2d 1, 8 (Mo. banc 1991). A venireperson is not automatically excluded for cause simply because he or she may have formed an opinion based on publicity. *Id.* The relevant question is whether the jurors had such fixed opinions about the case that they could not impartially judge the defendant's guilt or innocence under the law. *Id.* The trial court is in the best position to examine a venireperson's demeanor in making a determination of whether a venireperson should be removed from the venire because of bias, prejudice, or impartiality. *Storey*, 901 S.W.2d at 894.

The trial court did not abuse its discretion. Appellant's contention that he should have been permitted to identify the source of the venirepersons' pretrial information rests upon a faulty premise. The source of the jurors' information is not essential in determining whether they are biased or prejudiced. As stated above, in determining bias, the relevant question is whether the potential juror can set aside any preconceived opinions about the trial or the defendant and make an impartial determination of the defendant's guilt or innocence. *Id.*

The trial court did not prevent appellant from determining whether the venirepersons exposed to pretrial publicity could be fair, impartial, and unbiased. The trial court and counsel thoroughly inquired into the topic of pretrial publicity, asking questions designed to elicit responses from the venirepersons indicating the presence of bias or prejudice. The trial court asked the entire venire whether they had heard, seen, or read anything about the case or about appellant. Sixty-four answered affirmatively. The court separated the venirepersons who had been exposed to pretrial publicity from the remainder of the venire. The court then separated those venirepersons who had been exposed into small groups. The prosecutor asked each individual whether he or she had formed an opinion about the case as a result of the publicity. If the venireperson answered affirmatively, then the prosecutor asked the person whether he or she could set aside that opinion and make a determination of the appellant's guilt or innocence based on the evidence adduced at trial. Even if venirepersons had not formed an opinion, they were asked whether they could set aside the pretrial information and

determine appellant's guilt or innocence on the evidence at trial. The record reflects that some venirepersons were uncomfortable with answering the prosecutor's questions; others equivocated. The prosecutor then inquired further of those venirepersons who had difficulty answering.

Appellant's counsel also inquired of each individual venireperson who had been exposed to pretrial publicity whether he or she had formed an opinion about the case. Counsel then went into greater detail, asking the venirepersons whether they had been exposed to multiple sources of pretrial publicity, whether they considered the source(s) to be reliable, whether they had discussed their opinions with others, whether they agreed or disagreed with the opinions of others, and whether they had been exposed to the publicity before or after they received the summons for jury duty. Appellant's counsel was also allowed to inquire of the venirepersons whether they could set aside their opinions and render a verdict based only upon the evidence presented at trial. The questioning of the venirepersons was sufficient to allow appellant to determine whether the members of the panel could be fair, unbiased, and impartial.

■ Furthermore, appellant fails to establish a "real probability" that he was injured by the trial court's limitation on voir dire. *Id.* at 147. Appellant does not allege that any individual who served as a juror was biased or prejudiced against him. Presumably, appellant would argue that he could not identify the bias of any individual because he was not allowed to discover the source of the juror's pretrial publicity. As stated above, however, appellant had ample opportunity to question each individual juror to determine the relevant issue of whether the juror had an opinion that he or she could not set aside. Six venirepersons who responded affirmatively to the trial court's general question about being exposed to pretrial publicity were seated as jurors. Of the six members of the jury who had been exposed to

pretrial publicity, only two formed an opinion of the case. Both stated unequivocally that they could set aside their opinions and reach a verdict based solely on the evidence adduced at trial.

Appellant relies on *State v. Clark*, 981 S.W.2d 143 (Mo. banc 1998). In *Clark*, this Court held that the trial court improperly restricted voir dire where counsel was not permitted to ask any questions regarding the age of the child victim. *Id.* at 147. This Court held that the age of the victim was a critical fact – a fact with "substantial potential" for implicating bias – which should have been disclosed to the venire panel. *Id.* The appellant in *Clark* suffered a "real probability of injury" as a result of the trial court's restriction on voir dire. *Id.* The prosecutor emphasized at trial that a child victim was involved, referring to the victim as a "baby" on several occasions, and the record reflected that one juror left the room crying after viewing autopsy photos of the child. *Id.* at 147–48.

The present case is entirely distinguishable from *Clark*. In *Clark*, questioning the members of the venire panel regarding whether they could impartially judge guilt or innocence where one of the victims was a child was the only way for appellant's counsel to determine whether the venirepersons would be biased on account of the victim's age. In the present case, there was more than one way by which the trial court could determine whether the venirepersons were biased as a consequence of pretrial publicity. As discussed above, the trial court and counsel effectively employed other questions for that purpose.

The trial court did not err in refusing to allow appellant to inquire about the source of the venirepersons' information about the case.

■ In a related point, appellant claims that the trial court erred in denying his repeated requests for a continuance and a change of venue. He claims that the trial court abused its discretion given the totality of the circumstances. In support, ap-

pellant recites that a substantial number of venirepersons, sixty-eight percent, had heard about the case prior to trial, presumably from the article in the *Benton County Enterprise,* and many of them had either formed an opinion about the case or discussed it with others. Appellant reiterates that the trial court allowed only general voir dire and states that the trial court rejected his request for specific and individualized voir dire. He also points to the fact that six of the twelve persons who sat on the jury had heard about the case prior to trial, four of whom had read "a" newspaper article about the case. Appellant claims, therefore, that the trial court abused its discretion, in violation of his rights to due process, a fair trial, and a fair and impartial jury. U.S. Const. Amends. 5, 6, 14; Mo. Const. art. I, secs. 10 and 18(a).

 The decision to grant or deny a request for a continuance and change of venue rests within the trial court's discretion and will not be reversed absent a clear showing of abuse of discretion. *State v. Kinder,* 942 S.W.2d 313, 323 (Mo. banc 1996) (continuance); *State v. Feltrop,* 803 S.W.2d 1, 6 (Mo. banc 1991) (change of venue). A trial court abuses its discretion only when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there. *Feltrop,* 803 S.W.2d at 6. In assessing the impact of potentially prejudicial publicity on prospective jurors, the critical question is not whether they remember the case, but whether they have such fixed opinions regarding the case that they could not impartially determine the guilt or innocence of the defendant. *Id.* The trial court, rather than the appellate court, is in the better position to assess the effect of publicity on the members of the community. *Id.*

As discussed fully above, the trial court permitted a wide range of inquiry into the possibility of bias and prejudice. Through voir dire, the court was aware that sixty-four of ninety-two venirepersons had seen, heard, or read information about the case or about appellant. Of the sixty-four, the court struck seventeen for hardship or because they would place greater emphasis on the testimony of law enforcement officers. The court excused another nineteen venirepersons because of concerns about potential bias and prejudice against appellant. Some of those nineteen venirepersons clearly stated that they had opinions about the case that they could or would not set aside. Others were equivocal about whether they had opinions or whether they could set the opinions aside. The trial court, having observed each individual venirepersons' demeanor while counsel asked questions regarding pretrial publicity, evaluated whether each venireperson was affected by publicity and acted accordingly. The trial court did not abuse its discretion in refusing appellant's request for a continuance and change of venue.

 Appellant claims that the trial court abused its discretion in admitting, over his objection, the testimony of witness Ricky Ellis. Ellis, who was an inmate at the Christian County Jail in January 1992 and was housed in a cell two or three cells away from appellant's cell, testified at trial as follows:

Q: [By prosecutor] Did you ever hear him [appellant] refer to somebody by the name of Arnold?

A: Yes.

Q: And what did he say about this person he referred to as Arnold?

A: He said that he was going to have the guy killed because he had discussed a murder with him and he talked about it.

Larry Arnold had previously been appellant's cellmate in the Christian County Jail.[2] Appellant contends that Ellis' testimony constituted inadmissible evidence of uncharged crimes, wrongs, or acts.

2. At trial, the state also adduced Arnold's testimony that appellant had admitted to "killing an old lady by cutting her throat, stabbing her and carving an X on her body."

■ As a general rule, evidence of uncharged crimes, wrongs, or acts is not admissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Burns*, 978 S.W.2d 759, 761 (Mo. banc 1998). Evidence of uncharged crimes, wrongs, or acts of the defendant is admissible, however, if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect. *Id.*

■ Ellis' testimony was highly probative. Conduct and declarations of a defendant that are relevant to show a consciousness of guilt or a desire to conceal the offense are admissible because they tend to establish the defendant's guilt of the charged crime. *State v. Haymon*, 616 S.W.2d 805, 806–7 (Mo. banc 1981).[3] *See State v. Isa*, 850 S.W.2d 876 (Mo. banc 1993) ("A permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein.") Appellant's statement that "he was going to have [Arnold] killed because he had discussed a murder with him and he talked about it" tended to establish both that appellant described the murder to Arnold and that appellant wanted to conceal the evidence of his guilt. The testimony of Ricky Ellis legitimately tended to prove that appellant was the person who murdered Gladys Kuehler. The probative value of Ellis' testimony outweighed any prejudicial effect the testimony may have had. The trial court did not err in admitting Ellis' testimony.

■ Appellant alleges trial court error in overruling his objection to the following portion of prosecutor's penalty-phase closing argument:

Prosecutor: It's not enough that he go to prison. The only thing that is enough is that he be placed in the most restrictive possible environment we have until he is removed permanently from this world, and that is death row. That's not an easy decision to make. Nobody likes to make it. Well, welcome to the front lines of the war on crime.

Folks, we've observed every legal nicety here. Legal niceties –

Counsel for appellant: Your honor, I'm going to object to that characterization. A fair trial is not a legal nicety.

The court: Overruled.

Prosecutor: I don't mean to demean the process. I live and work in the process, but I use the term legal nicety not to demean but to describe it. We have observed the law here and Mr. Barton has had a fair trial.

Appellant invokes his right to due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and article I, section 10 of the Missouri Constitution. Appellant claims the prosecutor's remark was intended to disparage appellant for seeking a jury trial and the accompanying constitutional protections. He contends that the prosecutor's argument was intended to play into the public perception that criminal defendants are afforded too many rights and "get off on technicalities." Citing *State v. Lawhorn*, 762 S.W.2d 820 (Mo. banc 1988), and *State v. Stallings*, 957 S.W.2d 383, 392 (Mo.App.1997), appellant argues that reversal is required, because the prosecutor's comment was analogous to a "direct and certain" reference to a defendant's failure to testify.

■ It is correct that references to a defendant's failure to testify are prohibited, because such comments encourage the jury to make an inference of guilt from

---

**3.** Appellant argues that the consciousness of guilt rationale does not apply to testimony of a third party as to threats made by a defendant against another witness. Appellant cites no authority for this position.

defendant's refusal to testify as to matters within his knowledge. *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Allowing the state to comment on a defendant's refusal to testify amounts, therefore, to "a penalty imposed by courts for exercising a constitutional privilege." *Id.* The prosecutor's statement in this case, however, does not demand the scrutiny required when a prosecutor refers to a defendant's refusal to testify; the prosecutor's comment does not constitute an improper reference to a defendant's exercise of his constitutional rights. The prosecutor explained the term as meaning that the law had been observed and that appellant had had a fair trial. The statement, made in the context of arguing what penalty should be imposed, does not exceed the bounds of proper argument. While it may have been preferable for the prosecutor initially to have used the term "fair trial" instead of "legal niceties," the prosecutor explained his use of the term immediately after the court overruled appellant's objection. Appellant's assertion that the comment was intended to disparage appellant for seeking a jury trial and the accompanying constitutional protections is absolutely without basis. Likewise, appellant's contention that the comment was intended to "play into the public perception" that criminal defendants are afforded too many rights and "get off on technicalities" reads into the record an inference for which there is no support. The trial court did not abuse its discretion.

Section 565.035.3, RSMo 1994, requires this Court independently to review the sentence of death. Section 565.035.3(1) requires this Court to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other factor. A thorough review of the record reveals that the death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Section 565.035.3(2) requires this Court to determine whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found. The record reflects that the three statutory aggravating circumstances found by the jury are supported by the evidence.

■ Section 565.035.3(3) requires this Court to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant. Appellant asserts that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. Appellant is mistaken.

The crime in this case is similar to other cases in which the victim has been mutilated, as well as murdered. *See State v. Reuscher*, 827 S.W.2d 710 (Mo. banc 1992); *State v. Feltrop*, 803 S.W.2d 1 (Mo. banc 1991); *State v. Rodden*, 728 S.W.2d 212 (Mo. banc 1987); *State v. Jones*, 705 S.W.2d 19 (Mo. banc 1986).

Appellant murdered an elderly invalid who needed the assistance of a cane to move about. The crime is analogous to other cases in which victims who were elderly, disabled, or helpless were murdered. *See State v. Walls*, 744 S.W.2d 791 (Mo. banc 1988); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983); *State v. Sidebottom*, 753 S.W.2d 915 (Mo. banc 1988); *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993).

The sentence of death is consistent with the punishment imposed in other cases where the victim was murdered in conjunction with the perpetration of a sex offense. *See, e.g. State v. Lingar*, 726 S.W.2d 728 (Mo. banc 1987).

The evidence against appellant was strong. Kuehler's blood was found on appellant's clothing. Appellant was present in Kuehler's trailer during the time frame in which the crime was committed. Appellant lied to the police about that fact, as

well as about having received money from Kuehler on the day of the crime. Appellant attempted to dissuade others from entering the area in which the body was located. Appellant chose to knock on the window near the victim's body during the time that others were searching for Kuehler. Appellant confessed to stabbing an old woman more than forty times and to having carved an "X" on her body. The state's case, although circumstantial, contains strong evidence of appellant's guilt.

Considering the defendant, as section 563.035.3(3) requires, appellant had two prior felony convictions for assault. He boasted about the murder of Gladys Kuehler to other inmates, including reporting that he licked the victim's blood off his face and liked it.

The imposition of the sentence of death in this case was not disproportionate under all the facts and circumstances presented at trial.

The judgment is affirmed.

PRICE, C.J., LIMBAUGH and BENTON, JJ., and DOWD, Special Judge, concur.

WOLFF, J., dissents in separate opinion filed.

WHITE, J., concurs in opinion of WOLFF, J.

HOLSTEIN, J., not participating.

MICHAEL A. WOLFF, Judge, dissenting.

Fundamental to our notions of a fair trial is the right of the defendant to be convicted only on evidence produced in court, and not on evidence contained in newspaper stories. The newspaper story that appeared less than one week before the trial, to which two-thirds of the venire apparently were exposed, provided the information that Barton had previously been convicted of this murder by a jury in another county, but that his conviction had been overturned, that the victim was his landlady, and that he had been evicted from her trailer court. The latter is a "fact" that would have supplied a motive for the killing. At the time of *voir dire* examination of prospective jurors, the trial court and counsel knew that information as to motive was not going to be admitted into evidence, and defense counsel said the information was false. In the circumstances of this case, I believe the *voir dire* was inadequate to assure that Barton would be tried only on properly admitted evidence; therefore, I respectfully dissent.

In another, previous trial Barton had not been convicted of this killing because the jury was unable to agree on a verdict. Much of the certainty that his most recent trial is afforded, as well as evidence of aggravating circumstances supporting imposition of the death penalty, came from ever-helpful fellow prisoners. Perhaps the evidence of guilt may be subject to non-frivolous debate; if so, we should give particular scrutiny to assure that facts outside the courtroom did not assist in the conviction of this defendant. If we are unsure, a new trial should be afforded.

It may seem wasteful to try Barton again, since 24 jurors have unanimously found him guilty in two of his three trials. On the other hand, there were 12 who were unable to agree on Barton's guilt. Where the stakes are life and death, we do not hesitate to give trials careful review. It is impossible to guarantee a capital defendant a perfect trial, but he is entitled to one that is more than merely good enough. Since 1976, the death penalty has been reinstated in most states. It has been reported that nationally, since 1976, 77 death row prisoners found guilty by unanimous juries have been set free; the number of death row inmates later found to have been wrongfully convicted is thus about one-seventh of the number of prisoners executed.[1] Even a process as laudable

---

1. Viveca Novak, *The Cost of Poor Advice,* Time, July 5, 1999, at 38. *See also,* Carolyn

Tuft, *Ex-death Row Inmates Attack Capital*

as the American jury system gets it wrong a substantial number of times, as these data show, even though its findings are made unanimously and beyond a reasonable doubt. Obviously, we should conduct the most careful review possible, and in most instances we do. I do not fault the bulk of the principal opinion's review, except that the *voir dire* standard was insufficient to determine whether extraneous information, some of it purportedly untrue, may have provided some of the basis for Barton's conviction.

The *voir dire* examination conducted in this case resembles that upheld in *Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). There, as here, the trial court divided the prospective jurors into small groups, but denied questions as to the source and content of the pre-trial publicity. However, in *Mu'Min* the pre-trial publicity was extensive and the evidence of the defendant's guilt overwhelming. Here, the pre-trial publicity was not extensive – it was intensive or targeted, in that these Benton County jurors would have had no exposure to media accounts of the killing when it actually occurred some years before in a different county. Rather, these prospective jurors were exposed to a particular story in the local newspaper (and perhaps in other sources) immediately prior to the trial and apparently after the time the venirepersons were called for jury service. Of the initial venire of 92 persons, 63 or 64 had heard about the case. After initial excusals of venirepersons for cause, 40 prospective jurors were questioned, 17 had already formed an opinion about the case, and 27 had discussed the case with other persons and/or had heard someone else express an opinion about the case.

Opinions, of course, are based upon "facts", at least in part. When a juror is asked if he can set aside what he has heard and his own opinions, and render a fair verdict, most will respond affirmatively. In *Mu'Min v. Virginia*, only one of

the many jurors exposed to pre-trial publicity indicated an inability to do so. In Barton's case, there were more who expressed that opinion and were excused.

But if motive is a critical question in the minds of jurors, and the only evidence of motive is in the pre-trial publicity to which a substantial number of jurors were exposed, it is impossible to ascertain on this record that such a fact has truly been set aside. Missouri cases hold that a defendant's right to an impartial jury has been sufficiently safeguarded if the venireperson is questioned appropriately as to bias and states that his or her decision can be made based on the evidence presented at trial. The trial judge, of course, must believe the statement and believe the prospective juror to be unbiased. *State v. Nicklasson*, 967 S.W.2d 596, 611–612 (Mo. banc 1998).

However, the fact that prospective jurors say they can set aside what they have heard or seen should not end the inquiry. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), for instance, the court held that the evidence of deep and bitter prejudice that pervaded the community and was reflected in *voir dire* questioning was so prejudicial that a new trial was warranted, even though the jurors stated they could decide the case on the evidence presented at trial. Irvin was charged with six murders that had generated substantial local publicity and indignation. Eight of the twelve jurors admitted thinking the defendant was guilty, but each claimed they could remain impartial. In a much less extreme case than *Irvin*, the court in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), found that the exposure of some jurors during the trial to newspaper articles with facts about Marshall not admissible in evidence was so prejudicial as to entitle Marshall to a new trial. During trial for unlicensed dispensing of drugs, the prosecutor sought to introduce Mar-

shall's prior convictions for practicing medicine without a license. The trial judge refused to admit the prior convictions into evidence, but two newspapers containing the information got before seven of the jurors. The trial judge questioned the jurors individually, and each assured the court that they could decide the case only on the evidence presented at trial. *See also, Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

One of the weaknesses of the jury selection standards articulated since *Mu'Min v. Virginia,* supra, is that jurors instructed to disregard something will often do the opposite, though perhaps not consciously disregarding the court's admonitions. Kalvin and Zeisel, *The American Jury* (University of Chicago Press, 1971) reported that juries that had previous knowledge of a criminal defendant, such as criminal record, were more likely to convict. The same series of empirical studies of jury behavior found that jurors instructed to disregard a particular fact apparently did the opposite. *See,* Broeder, *The University of Chicago Jury Project,* 38 Nebraska Law Review 744 at 754 (1959). Even though there is "no doubt each juror was sincere when he said he would be fair," as the court said in *Irvin v. Dowd, supra,* "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes" of the average person. 366 U.S. at 727, 728, 81 S.Ct. 1639.

Our cases largely leave it to the trial judge to determine a prospective juror's bias, which is "often a question of demeanor." *State v. Storey,* 901 S.W.2d 886, 894 (Mo. banc 1995) (citing *State v. Schneider,* 736 S.W.2d 392, 403 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). This standard makes the trial judge's discretion virtually undisturbable because demeanor is not subject to appellate review. Especially with this deferential standard, we ought to review carefully not just the general notion of bias, but whether the trial court properly ascertained whether jurors had in their heads facts about the case that might form part of the basis for their verdict. To be specific, we cannot tell from this record whether some of the jurors came to court with the information that Barton is the man who killed his former landlady because she evicted him. The jurors were asked if they could set aside what they had heard or read – without inquiry as to what it was. Common sense tells us that it is probably not humanly possible to set aside these facts, especially where a person has no reason to believe that the "fact" about motive is false.

In this case, the risk that the trial process was tainted with extraneous evidence was sufficiently great that I would find it an abuse of discretion not to allow, at the very least, individual questioning of prospective jurors to ascertain the extent of their knowledge of matters that properly were not evidence in the case so as to ensure a panel as free as possible of factual taint and prejudging disposition. Such questioning would also have provided a basis for soundly determining whether the defense motion for change of venue or continuance should have been granted. Barton should be given a new trial.