STATE of Missouri, Respondent,

v.

Kenneth BAUMRUK, Appellant.

No. SC 83745.

Supreme Court of Missouri,
En Banc.

Aug. 27, 2002.

Rehearing Denied Oct. 22, 2002.

---

Gary E. Brotherton, Office of the Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Assistant Attorney General, Jefferson City, for Respondent.

MICHAEL A. WOLFF, Judge.

Kenneth Baumruk was convicted in 2001 of murder in the first degree for killing his wife in 1992 at the St. Louis County courthouse. The jury recommended the death penalty, and the court entered judgment accordingly. Baumruk appeals his conviction and sentence. This Court has exclusive appellate jurisdiction. *Mo. Const. art. V, section 3.*

Baumruk raises several points on appeal. The Court concludes that Baumruk, who had previously been found incompetent to stand trial, can be later indicted for the same offenses. But he should be tried in a venue other than St. Louis County. The trial court's refusal to grant Baumruk's motion for change of venue was an abuse of discretion in this unique case. Accordingly, the judgment is reversed, and the case is remanded with directions to the trial court to grant Baumruk's motion for change of venue.

**Facts**

On May 5, 1992, Kenneth Baumruk and his wife, Mary, were scheduled for a hearing in the St. Louis County circuit court for dissolution of marriage. Baumruk carried two .38 caliber handguns in his brief case to court that day. Before the scheduled hearing, the attorney for Baumruk's wife, Scott Pollard, discovered that he had a conflict of interest because he had represented Baumruk in a previous dissolution.

Before the hearing Pollard told Mary Baumruk that he recently discovered that he had represented Kenneth Baumruk around 1975. Pollard had been hired to modify the dissolution of Baumruk's first marriage. Pollard also told Garry Seltzer, Kenneth Baumruk's attorney, of the potential conflict, and the two attorneys met with Judge Samuel Hais in chambers. Judge Hais decided to make a record in open court and determined that the case would proceed only if both Mary and Kenneth Baumruk waived the conflict.

After Judge Hais administered the oath to Mary and Kenneth Baumruk, Pollard examined Mary regarding the conflict, and she stated that she wanted Pollard to remain as her attorney.

Baumruk then reached into his brief case and retrieved the two handguns, stood and shot Mary in the neck. Baumruk turned toward Pollard, shooting him in the chest. He then shot attorney Seltzer in the chest and, when Seltzer turned to

run, Baumruk shot him in the back. Next, Baumruk walked around the counsel table, put the gun near his wife's head and shot her again, killing her.

Judge Hais escaped through the door behind his bench as Baumruk shot at him and pursued him.

As Baumruk proceeded down the hall outside of the courtroom, bailiff Fred Nicolay pushed a clerk and two attorneys into another judge's chambers and closed and locked the door. Baumruk then shot Nicolay in the shoulder and ran out into the hall. Baumruk then shot at a police officer and then shot and wounded a security officer.

Police officers in the courthouse fired weapons at Baumruk, hitting him nine times. Two of the wounds were to his head.

St. Louis media provided extensive coverage of the incident, describing it as a "rampage," "shooting spree" and "mayhem" that "terrorized hundreds of people." In the media reports, several hundred citizens filled the streets around the courthouse, and more gazed down on the scene from their office windows. Quotes in the media compared the scene to a firefight in Vietnam. Hundreds were reported to have watched paramedics wheel Baumruk and the victims from the courthouse to ambulances.

After the shooting, the St. Louis County courthouse, which previously had not had metal detectors and other extensive security, received immediate attention. The number of security guards was doubled and metal detectors were installed.

Media coverage, which was massive, centered not only on the shootings, but also on domestic violence, concealed weapons, and the fears of domestic relations lawyers and clients. Several years after the incident, a poll indicated that approximately 70% of the county residents still remembered Baumruk's shootings at the courthouse. Baumruk was indicted in 1993 on first degree murder and multiple counts of first degree assault and armed criminal action.

Baumruk's motion for change of venue in the original case was granted. The Macon County circuit court, to which the case was transferred, found Baumruk to be incompetent to stand trial due to the brain injuries he suffered while he was being subdued. Baumruk was committed to the custody of the department of mental health.

The department of mental health commenced a guardianship proceeding in which a jury found that Baumruk did not require a guardian. *State ex rel. Baumruk v. Belt*, 964 S.W.2d 443, 443–444 (Mo. banc 1998). The Macon County circuit court refused to dismiss the charges. Baumruk sought review in this Court. This Court ordered the trial court to dismiss the indictment. *Id.*

After the dismissal in the Macon County circuit court, the St. Louis County prosecutor obtained an 18-count indictment in 1998, which included murder in the first degree in the death of Mary Baumruk.[1]

Baumruk's motion for a change of venue from St. Louis County was overruled.[2]

---

1. Other charges included nine counts for armed criminal action—class A felony and eight counts for assault in the first degree—class A felony. The trial of this case was on the murder charge only.

2. "[A] change of venue may be ordered in any criminal proceeding triable by jury for the following reasons: (1) that the inhabitants of the county are prejudiced against the defendant; or (2) that the state has an undue influence over the inhabitants of the county." *Rule 32.04(a)*.

### Competency to Stand Trial

■ Baumruk contends that the trial court erred by finding him competent to stand trial after a previous judge had found him to be incompetent and this Court had ordered charges against him be dropped. He contends that he suffers from amnesia and cannot recall the events surrounding the offense.

The previous judge did not find Baumruk permanently incompetent to stand trial. The order states: "The Court further finds that [Baumruk] lacks mental fitness to proceed and there is no substantial probability that [he] will be mentally fit to proceed in the reasonably foreseeable future." *Findings and Order, Circuit Court of Macon County, September 6, 1995.*

■ Section 552.020 provides that no person shall be "convicted or sentenced for the commission of an offense" if he or she suffers from a "mental disease or defect [that deprives the person of the] capacity to understand the proceedings ... or to assist in his own defense.... *This prohibition only lasts as long as the incapacity endures." Section 552.020 (emphasis added).* A defendant is competent when he "has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *State v. Johns,* 34 S.W.3d 93, 94 (Mo. banc 2000) (citing *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). It is the duty of the trial court to determine which evidence is more credible and persuasive. *Johns,* 34 S.W.3d at 105.

The trial court in this case conducted a second competency hearing pursuant to section 552.020, on September 25–27, and October 19, 2000, five years after the first hearing. The trial court determined that despite the injuries caused by gunshot wounds to his head, Baumruk was now competent to understand and appreciate the proceedings and assist in his own defense.

■ Even if Baumruk did suffer from amnesia that affected his ability to recall the events surrounding the incident,[3] amnesia does not bar prosecution of an otherwise competent defendant. *State v. Davis,* 653 S.W.2d 167, 173 (Mo. banc 1983).

The Macon County circuit court's determination of incompetency does not bar a later claim that Baumruk is competent to stand trial. Nor does the circuit court's finding of competency bar an assertion on Baumruk's behalf, in the trial court after remand, that he is incompetent to stand trial. *See section 552.020.11(6).*

### The Change of Venue Motion

■ Whether to grant or deny a change of venue is within the discretion of the trial court. *State v. Feltrop,* 803 S.W.2d 1, 6 (Mo. banc 1991).[4] That ruling will not be disturbed unless it was a clear abuse of discretion. *State v. Barton,* 998 S.W.2d 19, 27 (Mo. banc 1999). This discretion is abused when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur in that county. *Feltrop,* 803 S.W.2d at 6. However, the question is not whether the community remembers the case but whether the actual jurors

---

3. Baumruk's reliance on *State ex rel. Sisco v. Buford,* 559 S.W.2d 747 (Mo. banc 1978), is misplaced in that there is no evidence that he suffers from an "equivalent to a prefrontal lobotomy ... creat[ing] a neuter personality ..." as did the defendant in *Buford.*

4. The determination in 1993 that venue should be changed does not have collateral estoppel effect in the present case. *State v. Thomas,* 625 S.W.2d 115, 125 (Mo. banc 1981); *See also State v. Goddard,* 62 S.W. 697, 704 (1901).

of the case have fixed opinions such that they could not judge impartially whether the defendant was guilty. *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). There must be a "pattern of deep and bitter prejudice" or a "wave of public passion" such that the seating of an impartial jury is impossible. *State v. Johns,* 34 S.W.3d at 108 (Mo. banc 2000) (citations omitted). A change of venue is required when it is necessary to assure the defendant a fair and impartial trial. *Kinder,* 942 S.W.2d at 323 (citing *Groppi v. Wisconsin,* 400 U.S. 505, 507–511, 91 S.Ct. 490, 27 L.Ed.2d 571).

In *Johns* this Court found that there was no "wave of public passion" in part because the jury selection took place hundreds of miles from the trial location. 34 S.W.3d at 108. In *State v. Deck,* unlike *Johns,* the jury selection and trial took place in the same county as the commission of the crime, 994 S.W.2d 527 (Mo. banc 1999). The Court looked at the evidence presented regarding pretrial publicity and determined that the media coverage was not presumptively prejudicial because there was no "barrage of inflammatory publicity immediately prior to trial." *Id.* at 534.

■ This case is different. Six years after the shootings, in 1998, and three years before Baumruk's trial, a poll conducted by political scientist Dr. Kenneth Warren found that about 70% of St. Louis County residents remembered the shooting incident that occurred at the courthouse.[5] Dr. Warren's 1998 poll found that, of those who had heard about the shootings, over 80 percent said that Baumruk was definitely guilty and about 18 percent indicated that he was "probably guilty." Although the poll was conducted three years before the 2001 trial, most of its

findings are consistent with the examination of prospective jurors when the case was brought for trial. Sixty-three of the 99 people who appeared for jury service said they had heard about the case in the media. Eight of the twelve jurors who ultimately sat on Baumruk's jury remembered the incident. One of the jurors acknowledged that, as a result of the media reports, he believed Baumruk was guilty.

The trial court concluded that the passage of time made it possible to select a fair jury from residents of St. Louis County. *See Groppi v. Wisconsin,* 400 U.S. at 515, 91 S.Ct. 490 (Dissenting opinion of Justice Black). This conclusion is debatable, to say the least. If it were only debatable, this Court would in ordinary circumstances defer to the discretion of the trial court.

But the circumstances of this trial, held where the shootings occurred, are inherently prejudicial and denied Baumruk his right to a fair trial under the 6th and 14th Amendments. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

■ The environment of a trial must give jurors, who may otherwise have been carefully selected, a sense or appearance of neutrality. What happened in this case subverted these basic guarantees of trial by jury. The trial court went through the proper forms or procedures for selecting a fair jury. But, as the United States Supreme Court said in *Groppi,* quoting Justice Holmes: "any judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere." 400 U.S. at 510, 91 S.Ct. 490 (1971) (quoting Holmes'

---

5. The poll's actual finding was 71.5 percent with a margin of error of 4.5 percent.

dissent in *Frank v. Mangum*, 237 U.S. 309, 349, 35 S.Ct. 582, 59 L.Ed. 969 (1915)).

This required sense or appearance of neutrality is illustrated by *Turner v. Louisiana*, where two key witnesses for the state also served as the bailiffs attending the jury during the three day trial. 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Even though the bailiffs assured the judge that they had not communicated with the jurors about the case, the Court found such an association between the jurors and two key prosecution witnesses, especially when those witnesses were deputy sheriffs, was wrong and undermined the basic guarantees of trial by jury. *Id.* at 474, 85 S.Ct. 546.

This is not just a pre-trial publicity, improper venue case. At its core, this case raises a serious question as to the "impartiality of the adjudicator" because of the environment in which the trial was held. *See Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). The jurors were aware that the courtroom in which they sat was the same as the crime scene [6] and that the building in which they entered every day of trial was the scene of the terrifying events.[7] The prosecutor emphasized the point, appealing to "the citizens of this county" to punish Baumruk "for what he did in this courthouse."

■■ Jurors cannot be asked to place themselves in the shoes of the victims. *See State v. Rhodes*, 988 S.W.2d 521, 528 (Mo. banc 1999). Here, the jurors arrived at the courthouse and entered through metal detectors that had been installed as a direct result of Baumruk's shooting spree. Jurors walked the same halls, used the same elevators, stairwells, and escalators that were used by escaping victims. The trial was held in a courtroom nearly identical to the courtroom that was the scene of the crime.[8] The jurors, in effect, sat at the murder scene while determining guilt or innocence and the penalty to be imposed.

■■■ The right to jury trial guarantees a fair trial by a panel of impartial, "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Failure to give the accused a fair hearing violates the minimal standards of due process. *Id.* The verdict must be based on the evidence that is developed at trial regardless of the heinousness of the crime or the apparent guilt of the offender. *Id.* The association between the jurors and crime scene in this case created a prejudicial environment, which undermines the basic guarantee of trial by jury.

■■ There is no question, based on the evidence at trial, that Baumruk shot and

---

6. For example, in the state's opening statements the prosecutor said "You'll learn that on the second floor, the courtrooms are very much like this one is, the chambers and the offices in the back hall." And "Kenneth Baumruk, in a courtroom one floor below this courtroom, ... executed his wife ..."

7. Final jurors' and venire members' comments indicating that they were aware—even before the trial began—that the shootings occurred in that courthouse: Juror Joyner: I remember "just what happened in the courthouse ..." Venirewoman Seim: "I also think that's what prompted them to put the security system in downstairs." Venireman Parker:

"I remember ... the courthouse security guards and somebody shooting his wife in the courthouse." Venireman Littman: I remember "shooting in the courthouse ... exactly where in the court, I don't remember." Venireman Buyat: "I remember there was a lot of problems with the security here at the courthouse." Venireman Woolsey: "It's issues of the security of the courtrooms, that such an event could have occurred.... I remember it's like we had just done a security thing in the courthouse here, why didn't it work."

8. The case was tried in Division 3. The murder scene was Division 38.

killed his wife. It is tempting, because of the overwhelming evidence of Baumruk's guilt in committing the shootings, to hold that he was not prejudiced by the circumstances of this case in the guilt phase. If this Court were to so hold, it would affirm the conviction but remand for a new trial as to penalty—to be held in a different venue. However, "the impartiality of the adjudicator goes to the very integrity of the legal system," and "harmless-error analysis cannot apply." *Gray v. Mississippi*, 481 U.S. at 668, 107 S.Ct. 2045. The undisputed fact that Baumruk shot and killed his wife is only one aspect of the case. The disputed issues for the jury are his state of mind at the time of the shootings, his deliberation, and, ultimately, whether he is a suitable candidate for the death penalty.

This Court's constitutional duty, as set forth in decisions of the United States Supreme Court and this Court, is to assure that a defendant receives a fair and impartial trial. No such assurance is possible where the jurors were influenced by pretrial publicity and by the atmosphere of the trial setting. The jurors, for the entire duration of their service, were invited to re-live Baumruk's reign of terror and to identify with his victims at the very place where the events took place.

**Conclusion**

Many high-profile cases are tried in counties other than the place where the crime is committed, on changes of venue granted by trial court judges. Rarely if ever is a trial court's refusal to grant a change of venue disturbed on appeal because of the broad discretion given to trial court judges to make the determination as to whether or not a fair trial is possible in the county. The passage of time, in many cases, may diminish memories of a horrible event. In this case, however, the physical setting of the trial was a constant reminder of the horrible events that occurred in the very place where the trial was being held.[9] There is no reason to believe that St. Louis County can be a neutral place where Baumruk's right to a fair trial by jury can be assured.

Baumruk can be tried on the charges for which he has again been indicted. But he should not be tried where those shootings occurred.

The judgment is reversed, and the case is remanded with instruction to the trial court to grant the change of venue.

WHITE, LAURA DENVIR STITH and TEITELMAN, JJ., concur.

BENTON, J., dissents in separate opinion.

LIMBAUGH, C.J., and PRICE, J., concur in opinion of BENTON, J.

DUANE BENTON, Judge, dissenting.

Because the circuit judge did not abuse his discretion in holding trial in St. Louis County, I dissent.

This Court recites the proper test:

not whether the community remembers the case, but whether the actual jurors have fixed opinions such that they could not judge impartially whether the defendant was guilty [citing *Patton v. Yount*, 467 U.S. 1025, 1033, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847, 855 (1984)].

Therefore, much of this Court's discussion—particularly of the public-opinion poll and of the jury's awareness of media reports—is dicta. True, one juror initially said that media reports made him believe

---

9. This case does not stand for the proposition that venue is improper in *any* case where the crime was committed in the courthouse—only when circumstances surrounding that crime create a prejudicial atmosphere and there is extensive pre-trial publicity.

the defendant was guilty. He, however, later swore—under repeated questioning by counsel and the judge—that he could disregard that opinion and decide the case based on the evidence. The trial judge's determination of credibility is entitled to "special deference" and should be reversed only for "manifest error." *Patton*, 467 U.S. at 1038, 1031–32, 104 S.Ct. at 2892, 2888–89, 81 L.Ed.2d at 858, 854. See *State v. Feltrop*, 803 S.W.2d 1, 6 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991); *State v. Molasky*, 655 S.W.2d 663, 665–67 (Mo. App.1983), *cert. denied*, 464 U.S. 1049, 104 S.Ct. 727, 79 L.Ed.2d 187 (1984); *Provenzano v. Florida*, 497 So.2d 1177, 1183 (Fla. 1986), *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987).

In recent cases, the United States Supreme Court has reviewed the extensiveness of voir dire, in order to determine whether a fair trial can be held in a particular place. *Patton*, 467 U.S. at 1038, 104 S.Ct. at 2892, 81 L.Ed.2d at 858; *Murphy v. Florida*, 421 U.S. 794, 800–03, 95 S.Ct. 2031, 2036–38, 44 L.Ed.2d 589, 595–97 (1975); *Beck v. Washington*, 369 U.S. 541, 556–57, 82 S.Ct. 955, 963–64, 8 L.Ed.2d 98, 111–12 (1962). See also *Mu'Min v. Virginia*, 500 U.S. 415, 431–32, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493, 509–10 (1991). Here, voir dire lasted two, long days—from 9:03 a.m. and 8:30 a.m. until late in the evening—to pick 15 jurors from 99 veniremembers. In this case, "the testimony suggests that the *voir dire* resulted in selecting those who had forgotten or would need to be persuaded again." *Patton*, 467 U.S. at 1034, 104 S.Ct. at 2890, 81 L.Ed.2d at 856. See *United States v. Faul*, 748 F.2d 1204, 1213–15 (8th Cir. 1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985).

The circuit judge reasoned that the passage of nine years since the shooting in May 1992 allowed a fair trial in St. Louis County. "The *voir dire* testimony revealed that this lapse in time had a pro-found effect on the community and, more important, on the jury in softening and effacing opinion." *Patton*, 467 U.S. at 1033, 104 S.Ct. at 2889, 81 L.Ed.2d at 855. While the United States Supreme Court has not identified any particular lapse of time that in itself permits a fair trial, that Court approved a trial held four-and-a-half years after the crime, in a relatively rural county where the crime occurred. *Patton*, 467 U.S. at 1026–28, 104 S.Ct. at 2886–87, 81 L.Ed.2d at 851–52. This Court has affirmed a trial held six-and-a-half years after a widely-publicized series of murders in the St. Louis area. *State v. Leisure*, 749 S.W.2d 366, 376 (Mo. banc 1988), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988), on habeas review as *Leisure v. Bowersox*, 990 F.Supp. 769, 795–97 (E.D.Mo.1998).

In this case, this Court rules that holding the trial where the shooting occurred is "inherently prejudicial." Having state witnesses as custodians of the jury—as happened in *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)—is a structural defect that is inherently prejudicial. See *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331 (1991). A closer analogy to the present case is the use of extra, identifiable security guards in the courtroom—which is not inherently prejudicial. *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525, 533–34 (1986). In terms of jurors, presence of alternates with the deliberating jury is not inherently prejudicial. *United States v. Olano*, 507 U.S. 725, 740, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508, 523 (1993). Equally, photographic or broadcast coverage of criminal trials is not inherently prejudicial. *Chandler v. Florida*, 449 U.S. 560, 574, 101 S.Ct. 802, 809, 66 L.Ed.2d 740, 751 (1981). Nor is misjoinder of defendants inherently prejudicial. *United States v. Lane*, 474

U.S. 438, 446, 106 S.Ct. 725, 730, 88 L.Ed.2d 814, 823 (1986).

No doubt, the State may not personalize its case by suggesting personal danger to the jurors. *State v. Storey*, 901 S.W.2d 886, 901 (Mo. banc 1995). This record shows nothing like that. This Court's references (at footnotes 6–7) are tepid, passing comments. No juror would have thought he or she were one of the victims—the defendant's spouse, the attorneys, the bailiffs, law enforcement, or a judge.

If facts were disputed, the jurors' awareness of the scene, beyond the evidence, could be reversible error. See *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961). The disputed issues here—state of mind, deliberation, and appropriate sentence—are not affected by holding trial in the building where the murder occurred. "It is not required ... that the jurors be totally ignorant of the facts and issues involved." *Id.* at 722, 81 S.Ct. at 1642, 6 L.Ed.2d at 756.

I believe the defendant received a fair and impartial trial, free of the influence of pretrial publicity, a huge wave of public passion or an inflammatory atmosphere. St. Louis County—with over a million citizens, larger than seven of the states—was a proper venue for this case.