STATE of Missouri, Respondent,

v.

Nathan SPEAKS, Appellant.

No. ED 91573.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 8, 2009.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 21, 2009.

Application for Transfer Denied
Dec. 22, 2009.

72

William Jerome Ekiss (for Oral Argument), Wolff & D'Agrosa, Clayton, MO, and Craig A. Johnston (for Appellant's

Brief), Office of the Missouri Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Daniel McPherson, Assistant Attorney General, Jefferson City, MO, for Respondent.

KURT S. ODENWALD, Presiding Judge.

## Introduction

Nathan D. Speaks (Defendant) appeals from the trial court's judgment, following a jury trial, convicting him of two counts of murder in the first degree, in violation of Section 565.020, RSMo 2000 [1], and two counts of armed criminal action, in violation of Section 571.050. Defendant was sentenced to consecutive life terms in prison without parole for the two murder counts, and running concurrent to the life sentences, thirty years in prison for each of the armed criminal action counts. We affirm.

## Factual and Procedural Background

On February 19, 2008, Defendant was charged by the State of Missouri (State) in a substitute information in lieu of indictment with two counts each of murder in the first degree and armed criminal action. A jury trial was held on February 19, 2008, through February 26, 2008, which produced the following evidence relevant to this appeal.

Defendant's father, Roger Dale Speaks (Dale), lived in St. Charles. Dale had two safes in his house, one upstairs in a living room or entry room hall, and the other one in the basement. During the time that Defendant lived with his father, the basement safe was kept hidden behind the stereo. Defendant would play in that hidden compartment. After Defendant moved out of the house, there was a house fire and the safe was moved then further down the wall. The safe was small enough that two people could have carried it by hand, or one person could have carried it with the help of a dolly or hand truck. Dale had a number of hand dollies or hand trucks around the house because he used them frequently in his line of work.

Dale and Defendant's mother divorced while Defendant was living at home. Defendant then moved to live with his mother. Defendant's mother remarried a man named Michael Langdon (Langdon). Defendant was closer to Langdon than he was to Dale. Defendant, at one time while his father still was alive, had wanted to change his last name to Langdon. Evidence was presented that Dale had attempted to change his Last Will and Testament in a manner that would have excluded Defendant. The new will, however, was never finalized.

In the late 1990s, Defendant told his friends that his father had large sums of money hidden in a wall in the basement. Defendant talked to his friends about killing his father in order to take the money in the safe. Defendant said he would have to kill Dale because Dale would know that Defendant was the person who took the money. Defendant's friends had seen Defendant with a short snub nose black revolver, consistent with a .38-caliber revolver, and a loaded .45-caliber Glock with a laser sight on it, the safety off and a round in the chamber, in about early 2000. Defendant had mentioned to his friends possessing a .9-millimeter pistol and a .38-caliber gun, and asked a friend if he wanted to purchase the .9-millimeter pistol from Defendant for three or four hundred dollars. Langdon had been the previous owner of the snub nose revolver. When questioned by the police in March 2000, Defendant said that he shot a .9-millimeter gun when he was about fourteen or fifteen

1. All further statutory references, unless otherwise noted, are to RSMo 2000.

years old, but he never shot a revolver. Defendant denied possessing a handgun. Evidence was also presented that Defendant had been at a shooting range on March 3, 2000.

During the summer of 1999, Defendant attended a barbeque at his girlfriend's house, along with another friend, Darrius Sanders (Sanders). Sanders testified at trial that Defendant had approached him at the barbeque and wanted Sanders to help Defendant kill his father, in return for half of the money they would take from him. Sanders testified that Defendant told him that two safes containing fifty thousand dollars were located in the wall and the other one was a floor safe. This conversation concerned Sanders, who later went to Defendant's girlfriend and told her about the conversation. This conversation occurred before the murder took place in 2000. Sanders also testified that Defendant had asked him about the weight of the safe owned by Sanders's father-in-law.

In March 2000, Dale and a man named William Hamilton (Mr. Hamilton) were involved in a business of buying out estates and storage lockers. Dale would sell the antiques. Mr. Hamilton took the common household items back to his hometown in Arkansas for resale. On the morning of March 15, 2000, Mr. Hamilton drove to St. Charles to stay with Dale while they conducted their business. Mr. Hamilton's wife, Michelle Hamilton (Mrs. Hamilton), testified that she spoke with her husband on the morning of March 16, 2000. That evening, she called again around 8:30 or 9 p.m., and Dale answered the phone before Mr. Hamilton came to the phone. Mr. Hamilton told Mrs. Hamilton that he was planning on returning home the next evening, on March 17, 2000, after he and Dale met with a woman named Kathy Davis (Davis) to buy some furniture. When Mr. Hamilton did not return home and Mrs.

Hamilton did not hear from her husband, she became "frantic." Mrs. Hamilton testified that she called Davis and learned that her husband did not show up for the appointment on March 17. Mrs. Hamilton made several phone calls to Dale's house, but no answering machine picked up as it usually did. Mrs. Hamilton also called the police.

Dale's sister Shirley Lee (Lee) testified that she tried to call Dale on March 18, 2000, but got no answer. She also said that the answering machine did not pick up as it usually did.

Officer Douglas Endsley (Endsley) of the St. Charles Police Department testified that on the morning of March 19, 2000, he received an assignment to check on Dale's well-being. At Dale's residence, the house, windows, and detached garage were locked. Although he could not see through some heavy drapes in a window, Endsley could hear the sound of a television coming from inside the house. He stood on a chair to peer in a garage window and saw a white passenger vehicle in the garage rather than Dale's pickup truck. He and another officer also checked on Dale's place of business and found everything in order.

Officer John Stanczak, IV, (Stanczak) of the St. Charles Police Department testified at trial that on the evening of March 19, 2000, he received a radio call to check on Dale's well-being at his residence. When Stanczak arrived at Dale's house about 11:30 p.m., the house appeared secured. However, Stanczak looked through a window and saw what appeared to be a living room or family room with two bodies lying on the floor. The bodies later were identified as Dale and Mr. Hamilton. The officers entered the residence and searched the inside of Dale's residence. Stanczak said he noticed many valuable items still in

the residence, and both the door lock and deadbolt had been secured.

One of the police officers who processed the crime scene, Officer Robert Wayne O'Neal (O'Neal), testified that the stereo in the basement of Dale's residence had been pulled out from the wall a little. Further down the wall, there was a panel under the stairs that was pulled out. There were faint scratches in the concrete of the floor in the area behind the paneling under the stairs, and there were scratches in front on the linoleum. O'Neal testified that "it was the only thing in the whole residence that I noted that was odd." A safe was found in the hall closet on the main floor that appeared to be untouched. Both victims still had their wallets. However, the recording tapes were missing from the answering machine. The police dusted the residence for fingerprints but did not find any.

The chief medical examiner for St. Charles County, Mary Case (Medical Examiner), testified regarding the autopsies of both men. She testified that Mr. Hamilton had a contact gunshot wound of the head. The bullet entered his left forehead and traveled to the right, slightly backward and slightly downward. Medical Examiner recovered a medium caliber lead bullet inside the cranial cavity. Mr. Hamilton had no other wounds. Medical Examiner testified that Dale also received a contact gunshot wound to the back of the head, and the bullet traveled from back to front and from right to left. A medium caliber lead bullet was also recovered from his head. Dale did not have any other wounds.

Lieutenant Paul West (West) with the St. Charles Police Department testified that on March 20, 2000, he informed Defendant of his father's death. West testified that Defendant's reaction was "not very much at all. He was unemotional

about it." Defendant spoke with the police voluntarily at that point and told them that he was not very close to his father. During the conversation, Defendant told the police that the son of a woman Dale had been married to had broken into a safe that was in the upstairs closet approximately twelve years prior to the incident. Defendant did not mention to the police the safe in the basement. Also during his interview with the police on March 20, 2000, Defendant told the police that on March 16 and 17, 2000, he was at Richie Batchelder's (Batchelder) house watching movies until late those nights, and then he went home. Defendant said he stayed home on March 18 and 19, 2000, to care for his new puppy.

West testified that he contacted Batchelder. The first time they spoke, Batchelder confirmed Defendant's whereabouts, but the police spoke to him a second time during which Batchelder corrected himself, West said. Batchelder testified at trial that Defendant had called him to inform him of his father's death, that Defendant told him that the detectives were trying to rule Defendant out as a suspect, so Defendant had told the detectives that he was at Batchelder's house a couple of nights that week, March 16 and 17. Defendant suggested that the police would contact him to check the dates. Batchelder testified that later he was reminded by a friend that Batchelder was with a friend at the St. Charles casino on March 16 from the afternoon through the evening. Batchelder called the police back to correct his prior statement and specify instead that he had been with Defendant on March 15 and 17, 2000, but not March 16. Batchelder also called Defendant and told him that he could no longer provide an alibi for Defendant on March 16, 2000.

The police interviewed Defendant again on March 31, 2000. Defendant told the

police that he was either at Batchelder's house or his house on March 16, 2000. He told the police that he knew he was at Batchelder's house a couple of days that week, but he was unsure exactly what days he was there. When the police showed Defendant Batchelder's written statement regarding March 16, Defendant told the police that Batchelder was lying.

Sergeant Michael Akers with the City of St. Charles testified at trial that while he was patrolling through the casino parking garage on March 20, 2000, he came upon a vehicle that fit the description of the truck missing from Dale's residence: a 1992 GMC pickup, white with a blue stripe. The keys were in the ignition of the vehicle, he said, although the doors were locked.

Laniea Brown (Brown) testified that she was leaving the casino in St. Charles around 10:00 p.m. on March 16, 2000. As she walked through the parking garage she noticed two vehicles pull into the garage and park. Brown testified that someone got out of the second vehicle, which was a pickup truck. Instead of walking toward the casino, the man walked more toward the back of his vehicle and in the direction of Brown, which concerned her. Brown testified that the man stopped before he reached her, and instead went to the other vehicle that had entered the garage before him, a big two-tone gray Suburban truck with a red pin stripe down the side and tinted windows. After the man entered the passenger side of the Suburban, it drove off. Brown said she had looked at the man hard, and saw that he was white and younger, wearing blue clothing with a short-sleeved shirt even though it was cold outside. She also remembered that the Suburban had a decal advertisement on the back. Brown said the man made her nervous. She drove out of the parking garage after the Suburban.

The State introduced a video surveillance tape of the garage's entrance and exit from that time on March 16, 2000, and Brown identified the two vehicles that she saw coming into the garage as well as the Suburban and her own vehicle leaving the garage. The police had shown Brown a line-up and had asked her if she could identify the man she saw. Brown identified the Defendant.

During an interview with Defendant, police showed Defendant still photographs from the surveillance camera in the casino parking garage on March 16, 2000. Detective Michael James Harvey (Harvey) with the St. Charles City Police Department testified that when he asked Defendant whose Suburban was in the photograph, Defendant responded, "we both know whose Suburban that is." Defendant told the police that he had never been on the casino parking lot. When told that there was a witness who saw him exit Dale's vehicle and get into the Suburban, Defendant responded, "that makes me sick," and stood up.

An officer testified, over Defendant's objection, as to the search of Defendant's residence, which was also the Langdon residence, both in March 2000 and October 2000. A number of firearms were found during the search, although the officers did not find the two firearms to which they believed Defendant had access, including a .38-caliber revolver and a .45-caliber semi-automatic pistol. The police did find two boxes of .38-caliber ammunition, however, in the master bedroom and several other boxes, along with numerous rounds of ammunition in the front entry closet.

The State introduced and offered into evidence, over Defendant's objection, the ammunition as exhibits 126, 127, and 128. Additionally, the police found and seized .45-caliber ammunition between Defendant's bed mattress and box spring. The

trial court admitted, over Defendant's objection, a photograph of that box of bullets. The police also found a box of unused latex gloves in the residence. Furthermore, over Defendant's objection, the State introduced into evidence an insurance proof of loss claim, which was subsequently dropped by Langdon, claiming a burglary at the Langdon residence in which various guns had been stolen in 1997, including several of the guns that were found in the residence during the police search. Some of the guns that were reported with the insurance claim were not found in the search, including a .38-caliber snub nose revolver, a .357 snub nose revolver and a .44 magnum revolver.

Before trial, Defendant filed a motion in limine seeking to prohibit the State from introducing, discussing, or making reference to a police report or testimony regarding a possible burglary at the Langdon residence, an insurance claim made concerning alleged stolen items, and a comparison of items claimed to be stolen versus those later found in the residence; evidence or testimony about Defendant's possession or carrying of a firearm; and firearms and/or ammunition found at the Langdon residence. The trial court denied the motion in limine concerning the Langdon burglary and insurance claim, and Defendant's possession or carrying of firearms as well as the firearms and/or ammunition found at the Langdon residence.

The bullet recovered from the body of Mr. Hamilton, and the bullet recovered from the body of Dale were analyzed and identified as .38-caliber bullets and were found to be fired from the same gun. The bullets also were compared to those bullets seized from the Langdon residence and were found to be similar in design and construction, except for "the distortion and the damage to the two removed from the victims."

The police also processed Langdon's Chevrolet Suburban, in which they found an inverted latex glove as well as a holster in the center console between the driver's seat and front passenger seat. The holster would fit a snub nose .38-caliber revolver, but would fit other guns as well. On cross-examination, defense counsel asked Ricky Edward Luetkenhaus (Luetkenhaus) of the St. Charles County Sheriff's Department whether the police found a .357 magnum at the Langdon residence, which also fit the ammunition of a .38-caliber revolver. Luetkenhaus answered in the affirmative. Defense counsel also asked Luetkenhaus whether he knew if Defendant owned more than one handgun, and Luetkenhaus answered that there were several handguns in Defendant's residence.

Defendant's ex-girlfriend, Brandi Cross (Cross), testified that she was dating Defendant around late 2004, early 2005, and noticed that Defendant always carried with him large sums of cash. Defendant had told Cross that he shared a safe deposit box with Langdon in Wright City. After reading some articles about Defendant's case, Cross called the police to discuss some of her concerns about Defendant. Then she decided she wanted nothing to do with Defendant. Cross told Defendant she had spoken to the police. Cross testified that three weeks later, she received a phone call message from Defendant in which he threatened to kill and decapitate her ten-year-old son. A recording of the message was played, and the transcript was passed to the jury, over Defendant's objection. Prior to Cross's testimony, Defendant renewed his objection and argued that the evidence was irrelevant and more prejudicial than probative. The State argued that Cross had told Defendant that

she had gone to the police, discussed the case, and then told him that she wanted nothing more to do with him because of these allegations. Within three weeks of her going to the police, the State continued, Defendant left Cross the threatening message. The trial court overruled Defendant's continuing objection. Before trial, Defendant had filed a motion in limine seeking to prohibit the State from introducing, discussing, or making reference to Defendant's statements and tape recordings regarding threatening statements by Defendant to Cross. The trial court denied the motion in limine concerning Cross.

During the cross-examination of Dale's sister, Brenda Sue Ellis (Ellis), Defense counsel questioned whether she remembered being asked by the police if she suspected anyone who wanted to kill her brother. The State objected and counsel approached the bench. Defense counsel informed the trial court that Ellis would answer, "Craig Exner, Keith Nerberger." The trial court then stated, "I believe this is basically in line with my pretrial ruling on the motion in limine, so I am going to have to sustain the objection at this time. It can be a continuing objection."

Additionally, during the testimony of Mrs. Hamilton, Defense counsel asked her whether she advised the police that on two separate dates, someone came looking for her husband. The State objected, stating that Defense counsel was trying to suggest another person or people did the crime. The trial court sustained the objection as continuing "until such time as the Court has made some sort of a ruling about it." Defense counsel also asked Mrs. Hamilton whether she told the police that her husband had had some difficulty with gambling, and the trial court sustained the State's objection as to relevancy. Outside of the presence of the jury, defense counsel told the trial court,

Judge, there is going to be testimony about Mr. Hamilton having financial difficulties. In fact, his wife had admitted to them they lost their house [as a] result of a gambling problem. They had been borrowing money. People will testify from my perspective at least that I would be calling to talk about [Mr. Hamilton] owing money, writing bad checks, things of that nature.

In sustaining the objection as continuing, the trial court stated, "I think just this mere information without something to substantiate it, or to prove direct connection with this is not permitted by the case law, as I understand it."

Before trial, the State had filed a motion in limine to prohibit evidence that another person may have committed the crimes. The State predicted that Defendant would attempt to argue that Craig Exner (Exner), and other people as well, might have been the murderer, but there was no evidence connecting him to the crimes and the only evidence was hearsay. Defendant argued that police reports stated that Exner had used the internet to find someone to murder the victims in this case. Defendant argued that it was for the jury to decide whether he was excluded by other information. Although Defendant claimed to have an endorsed witness who supposedly observed Exner on the internet, the State argued that the police report indicated no witness actually saw Exner. Defendant did not dispute that argument. The trial court stated that it was inclined to grant the State's motion, but wanted to give the motion additional consideration prior to the presentation of evidence. The trial court later sustained the motion in limine and directed defense counsel to seek a preliminary hearing outside the presence of the jury before attempting to

introduce any evidence designed to implicate other persons in the murders.

Defendant did not testify at trial.

After the conclusion of all the evidence, the jury found Defendant guilty of the charged offenses. Defendant filed a motion for a new trial, claiming that the trial court erred in overruling his objection to and request to exclude the propensity testimony of Cross and the presentation of a phone recording left on Cross's phone by Defendant; the trial court erred in denying Defendant the opportunity to cross-examine Mrs. Hamilton concerning her husband's gambling problem, that he had borrowed money from a "loan shark," that the Hamilton family had lost their home because of his gambling trouble, and about individuals coming to her place of employment looking for her husband the Sunday before he was murdered. Defendant claimed that the trial court erred in denying his right to present testimony that another person was responsible for the victims' deaths because this denied Defendant the right to present a defense. Additionally, Defendant claimed that the trial court erred in overruling his objection to the introduction of weapons found at the Langdon residence, admitting a comparison of the weapons claimed stolen versus those found in the Langdon residence after the murder, and admitting testimony about the insurance claim filed by Langdon, admitting testimony that Defendant possessed firearms prior to the murder, and admitting the State's exhibits.

On June 16, 2008, the trial court overruled Defendant's motion for a new trial and sentenced Defendant to life in prison without parole for the first-degree murder charge and a concurrent term of thirty years of imprisonment for the armed criminal action charge with regard to the murder of Dale. Running consecutively to the sentence regarding Dale, the trial court imposed a sentence of life in prison without parole for the first-degree murder charge of Mr. Hamilton and a concurrent term of thirty years of imprisonment for the armed criminal action charge.[2]

This appeal follows.

*Points on Appeal*

Defendant raises four points on appeal. In his first point, Defendant alleges that the trial court abused its discretion in overruling his objections and allowing the State to "parade" testimony and evidence concerning numerous weapons and ammunition, because those rulings denied Defendant his rights to due process, a fair trial, and to be tried for the offense with which he was charged, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 10, 17, and 18(a) of the Missouri Constitution. Defendant contends that these weapons and ammunition were not directly connected to the crime or to Defendant, were inherently prejudicial, and had no probative value since they could not assist the jury in deciding any of the issues presented in the case because the evidence was uncontroverted that the murder weap-

2. In the trial court's sentence and Judgment, the court did not check the box indicating that Defendant had been found to be a prior offender, but instead checked the box labeled "Not Applicable." A mistake in a sentence and judgment form involving the marking of boxes memorializing a defendant's prior and persistent status is a clerical mistake that may be corrected by a nunc pro tunc order. *State v. Carroll*, 207 S.W.3d 140, 142 (Mo.App. E.D. 2006). A remand to the trial court should be ordered for the limited purpose of entering an amended written judgment that reflects the trial court's finding that Defendant was a prior offender. *Id.* at 143.

on was either a .38– or .357-caliber gun. Accordingly, Defendant's possession of weapons and ammunition that could not have been involved in the murders was neither logically nor legally relevant and served only to color Defendant's character as someone tending to possess dangerous weapons.

In his second point, Defendant alleges that the trial court abused its discretion in allowing the State to present evidence that about five years after the charged offense, Defendant had left a phone message for his ex-girlfriend wherein he threatened to decapitate her ten-year-old son. Defendant asserts that any "marginal" probative value was outweighed by the prejudicial effect of this inflammatory evidence, thereby violating Defendant's rights to due process, a fair trial, and to be tried only for the offense with which he is charged, as guaranteed by the Fourteenth Amendment to the United States Constitution, and Article I, Sections 10, 17, and 18(a) of the Missouri Constitution. Defendant claims that this evidence of uncharged other crimes did not prove any issue in dispute, nor did it concern the charged offense; rather, it was only propensity evidence that Defendant was a bad, violent person, which only served to divert the jury's attention away from the charged offense.

Third, Defendant alleges that the trial court abused its discretion in sustaining the State's objections and not allowing the jury to hear evidence showing that Exner had a motive to kill the victims and had taken steps to have them killed. The prohibition of this evidence, Defendant argues, denied him his rights to due process, a fair trial, and to present a defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. Defendant alleges that he was entitled to present

evidence showing that Exner had made statements about wanting the victims dead, Exner owed Dale more than $100,000, that Dale was prepared to prosecute Exner for passing bad checks, that Exner wanted to confront Mr. Hamilton about money Mr. Hamilton owed him, that Dale had caused Exner to lose everything, and that Exner had been on the internet looking for a hit man to kill the victims. Defendant argues that such evidence would have been proof that Exner committed some act directly connecting him with the crime.

Finally, in his fourth and final point, Defendant alleges that that trial court abused its discretion in sustaining the State's objections and not allowing Defendant the opportunity to cross-examine Mrs. Hamilton about: individuals coming to her place of employment looking for her husband the Sunday before he was murdered; her husband's gambling problem; her husband borrowing money from a loan shark; and losing their family home in Arkansas because of her husband's gambling trouble. Defendant argues the exclusion of this evidence denied him his rights to due process, a fair trial, and to present a defense as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. Defendant claims that he was entitled to present this evidence to show the jury that someone other than Defendant had a motive to kill the victims and that it was possible that Mr. Hamilton, and not Defendant's father, was the real target of this crime.

*Standard of Review*

Each of Defendant's points on appeal addresses specific evidentiary rulings made by the trial court. A trial court has broad discretion to admit or exclude

evidence. *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). A trial court's ruling on the admission of evidence will not be reversed unless the court has clearly abused its discretion. *Id.* "That discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id., quoting State v. Gonzales,* 153 S.W.3d 311, 312 (Mo. banc 2005). The appellate court reviews for prejudice, not just error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *Id.* Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial. *Id.*

## Discussion

### Point I—Evidence of Weapons and Ammunition was Relevant and Admissible.

Defendant's first point addresses the trial court's admission of evidence relating to numerous weapons and ammunition. Defendant contends that the weapons and ammunition that were the subject of the testimony and documents admitted into evidence were not directly connected to the crime or to Defendant and were inherently prejudicial. Such evidence, Defendant argues, had no probative value because it could not assist the jury in deciding any of the issues presented in the case. We disagree.

▆▆ Weapons or objects connected with the defendant or the crime, when sufficiently identified, become relevant and possess probative value. *State v. Wynne,* 353 Mo. 276, 182 S.W.2d 294, 299 (1944). "As a general rule weapons and objects not connected with the defendant or the crime are not admissible unless they possess some probative value." *Id.* Missouri courts subscribe to the principle that "[l]ethal weapons completely unrelated to and

unconnected with the criminal offense for which an accused is standing trial have a ring of prejudice seldom attached to other demonstrative evidence." *State v. Charles,* 572 S.W.2d 193, 198 (Mo.App.1978). "[A]ppellate courts of this state have been quick to brand their admission into evidence, and any display of or reference to them during closing argument, as prejudicial error." *Id.* Accordingly, "[t]he legal principles in cases like *Charles* are not to be winked at or ignored nor to be treated as so much pap." *State v. Moore,* 645 S.W.2d 109, 110 (Mo.App. W.D.1982). We are duly cognizant of these admonitions as we address Defendant's concerns.

▆▆ On the other hand, weapons found at or near a crime scene or that help explain the manner in which a crime is committed are generally found to be admissible. *State v. Ramsey,* 820 S.W.2d 663, 666 (Mo.App. W.D.1991). "Where the evidence in question tends to connect a defendant with the crime, proves the identity of the deceased, shows the character of wounds or throws light upon a material fact in issue, it is properly admissible." *Id.*

▆▆ Additionally, Missouri courts follow another general rule that "evidence of uncharged crimes, wrongs, or acts is not admissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Barton,* 998 S.W.2d 19, 28 (Mo. banc 1999). Such evidence is admissible, however, "if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect." *Id.*

▆▆ At issue here is the testimony regarding weapons and ammunition found in the home Defendant shared with his step-

father, documents relating to an insurance claim made by Defendant's stepfather in 1997 which listed various guns that were alleged to have been stolen, and the subsequent abandonment of that insurance claim in 1998. Defendant argues that *State v. Perry*, 689 S.W.2d 123, 125 (Mo. App. W.D.1985), is instructive in that weapons not connected with the accused or the crime charged lack any probative value and their admission into evidence is inherently prejudicial and constitutes reversible error. In *Perry*, a twenty-gauge shotgun was found in the back seat of the defendant's mother's car, which the defendant was driving when he was apprehended. The State presented the shotgun as evidence during the defendant's robbery trial. *Id.* No evidence was presented to show that the defendant owned the shotgun found in the car, or that Defendant was even aware of the shotgun's presence in the car. *Id.*

The State argues, on the other hand, that the holding in *State v. Norman*, 243 S.W.3d 466, 470–71 (Mo.App. S.D.2007), is instructive because there the State introduced evidence that a search of the defendant's home yielded several handguns, rifles and shotguns, none of which was a .25-caliber handgun determined to have been used in the murder. *Id.* The search did, however, yield .25-caliber bullets and reloading equipment. *Id.* The Southern District found that the trial court did not err in admitting such evidence, noting that the evidence was relevant to the State's theory that the defendant used a .25-caliber pistol to kill the victim. *Id.* Although the defendant in *Norman* conceded that the challenged evidence was logically relevant to the State's trial theory, Defendant here does not concede the same, but argues that the evidence is not relevant. We disagree.

Defendant cites *State v. Richards*, 334 Mo. 485, 67 S.W.2d 58, 60 (1933), in support of his argument that the guns and ammunition found at his stepfather's house could not be found by a jury to have any relation to the murders of Dale and Mr. Hamilton. In *Richards*, the Supreme Court held that it was error to admit a pistol seized from a co-conspirator's home where there was no evidence that the defendant had possessed or seen the firearm. Unlike the case in *Richards*, however, here, sufficient testimony exists from which a trier of fact reasonably could find a connection between Defendant and the weapons found in the Langdon residence. In *Richards*, the "state wholly failed to show any connection between the articles found at the [co-conspirator's] home and appellant." *Id.* The situation is significantly distinguished from the facts in this case.

Defendant correctly states the law that evidence of unrelated firearms is unduly prejudicial. However, Defendant's "argument [ ] begs the question." *State v. Cofield*, 95 S.W.3d 202, 205 (Mo.App. S.D. 2003). While the testimony and evidence of the guns recovered in the residence shared by Defendant and his stepfather is not particularly strong, neither is such evidence so tenuous so as to deprive it of the necessary probative value allowing its admission by the trial court. We cannot state that a jury could not reasonably find a connection between the guns and ammunition recovered and the crimes of which Defendant was convicted. Accordingly, the law Defendant recites under this argument is unavailing. *See id.* Unlike the facts in *Perry*, 689 S.W.2d at 125, which show no linkage of a shotgun exhibit to the crime the defendant committed, the evidence of the weapons and bullets in the instant case were shown to have a sufficient minimal connection to Defendant, and to the crime with which Defendant was charged. Here, evidence was presented that the bullets found in the Langdon

residence were nearly identical to those recovered from the victims, except for the damage done to the bullets that had been fired. It was not insignificant that the bullets recovered from the Langdon residence were identical to those recovered from the victims, yet the weapons necessary to fire such bullets were missing. Moreover, testimonial evidence from Defendant's friends demonstrated that Defendant in fact had possessed and owned a weapon that matched the caliber weapon used to commit the murders, which was now missing. Testimony also linked the weapons to Langdon as their previous owner, and therefore we find it appropriate that evidence of his insurance claim regarding the weapons also was admitted. The insurance claim provided relevant evidence that weapons of the same type used to murder Dale and Mr. Hamilton were at one time in the residence that Langdon shared with Defendant. Finally, exculpatory statements, when proven false, demonstrate consciousness of guilt. *State v. Williamson*, 809 S.W.2d 16, 19 (Mo.App. E.D.1991). Here, the State introduced evidence that directly contradicted Defendant's denial that he had possessed or even used any gun since he was fourteen or fifteen years old. The cumulative effect of this evidence was sufficiently probative and logically relevant because it has a legitimate tendency to connect Defendant with the type of weapon used in the crime, and establish Defendant's guilt of the charges for which he is on trial.

We also find that the contested evidence is legally relevant in that its probative value outweighs its prejudicial effect. In *Norman*, 243 S.W.3d at 470, the Southern District noted the little prejudicial effect of the weapons admitted as evidence by explaining that defense counsel had asked during voir dire if anyone would hold the defendant's gun ownership against him, and that no one responded. *Id.* at 471. Similarly, here, defense counsel asked during voir dire if anyone would believe that Defendant committed the murders just because he possessed firearms, and no one responded in the affirmative. The State asked how many veniremembers owned firearms themselves and received several responses. Additionally, defense counsel received multiple responses when he asked how many veniremembers had gun permits, but none of the responses indicated the mere possession of a gun meant that the person in possession committed a murder.

In light of the logical and legal relevance of the evidence presented, Defendant's first point is denied.

**Point II—Evidence of Defendant's Threat was Relevant and Admissible.**

Next Defendant alleges that the trial court abused its discretion by allowing the State to present evidence of Defendant's phone message in which he threatened to decapitate his ex-girlfriend's ten-year-old son because any probative value was outweighed by the prejudicial effect of this evidence. Defendant claims that this evidence of another uncharged crime did not prove any issue in dispute, nor did it concern the charged offense; rather, it was only propensity evidence that Defendant was a bad, violent person, which only served to divert the jury's attention away from the charged offense.

Generally, evidence of uncharged crimes or acts is inadmissible to show a defendant's propensity to commit such acts. *State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999). Such evidence may cause a jury to convict a defendant on the basis of perceived propensities rather than on the basis of substantial and competent evidence. *State v. Henderson*, 105 S.W.3d 491, 495 (Mo.App. W.D.2003). Only when the evidence of uncharged acts clearly is

logically and legally relevant to establishing the defendant's guilt of the crime for which he is on trial is it admissible. *Id.* Evidence is logically relevant "if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial," and legally relevant "if its probative value outweighs its prejudicial effect." *Id.*, *quoting State v. Barriner*, 34 S.W.3d 139, 144–45 (Mo. banc 2000). Several well-recognized exceptions allow admission of evidence of uncharged crimes. *Id.* "Conduct and declarations of a defendant that are relevant to show consciousness of guilt or a desire to conceal the offense are admissible because they tend to establish the defendant's guilt of the charged crime." *State v. Davidson*, 242 S.W.3d 409, 415 (Mo.App. E.D.2007), *quoting Barton*, 998 S.W.2d at 28. "Specifically, evidence that the defendant threatened a witness is admissible to show consciousness of guilt." *Id.*

■ In *Barton*, 998 S.W.2d at 28, the Missouri Supreme Court found that the probative value of testimony of one witness outweighed any prejudicial effect where the appellant stated to the witness that "he was going to have [his former cellmate] killed because he had discussed a murder with him and he talked about it." The Court found that this testimony tended to establish both that the appellant described the murder to his former cellmate and that the appellant wanted to conceal the evidence of his guilt. *Id.* Thus, it "legitimately tended to prove that appellant was the person who murdered [the victim]." *Id.*

Furthermore, in *State v. White*, 870 S.W.2d 869, 875 (Mo.App. W.D.1993), the Western District disagreed with the appellant who argued on appeal that a detective's testimony that the appellant had threatened to "kick his ass" prejudiced him by exposing the jury to unrelated, uncharged misconduct and did nothing to establish the guilt of the crimes charged. In its ruling the court noted that the appellant's "threatening remarks are inconsistent with the demeanor of an innocent person who in self-defense accidentally shot someone." *Id.*

Defendant argues that his case is comparable to *State v. Batiste*, 264 S.W.3d 648, 652 (Mo.App. W.D.2008), in which the appellate court reversed a child abuse conviction because the State was allowed to present evidence that the defendant had abused the same child before the charged incident. In *Batiste*, "[t]he evidence had no other discernible purpose than to establish that [the defendant] had abused [the victim] in the past and was, therefore, likely to have committed the charged crime. In other words, its purpose was to show that [the defendant] had a propensity to abuse [the victim], and its obvious purpose was to persuade the jury to convict him based on his propensities." *Id.*

■ Defendant here argues that the State's argument had "surface appeal" in showing some consciousness of guilt, but that the detailed testimony and evidence exceeded what the State needed to establish Defendant's consciousness of guilt. Defendant complains that the State went too far when it accentuated Defendant's evil propensity during closing argument, although we note that Defendant did not object during such argument. Our review of the record supports Defendant's claim that the prosecutor heavily stressed this evidence during the trial and closing argument. The State could have accomplished its evidentiary goals in a less aggressive and graphic manner, and with a reduced risk of inviting error by the trial court. However, while we agree that the State could have presented a less detailed version of the happenings with Cross, we do not find that the trial court erred in allowing the evidence of Defendant's threats

and the tape recording. We cannot say that Defendant's tone of voice and emotion conveyed by the tape recording may not be relevant to the jury's consideration of Defendant's consciousness of guilt. Unlike *Batiste,* here the evidence presented was a threat, not an actual crime committed in a similar manner in which the crime charged here was committed. The evidence had a distinct purpose of demonstrating Defendant's threat to Cross's son within three weeks after Defendant learned that Cross had spoken with the police about his case. We agree with the State that Defendant should not be heard to complain about prejudice resulting from his own words and conduct. "Any prejudice [Defendant] may have suffered from the admission of his own epithets at trial 'can be attributed to the very probativeness of the challenged evidence.'" *State v. McDaniel,* 254 S.W.3d 144, 145 (Mo.App. E.D.2008), *quoting State v. Johnson,* 201 S.W.3d 551, 557 (Mo.App. S.D.2006). "A '[d]efendant is not entitled to exclude evidence merely because it damages his case.'" *Id.*

Finding no prejudice in admitting the evidence of Defendant's threatening message left for Cross, we deny Defendant's second point on appeal.

## Point III and Point IV—The Trial Court Acted within its Discretion to Exclude Evidence of Other Suspects.

We consider together Defendant's third and fourth points, which allege that the trial court abused its discretion sustaining the State's objections and not allowing the jury to hear evidence regarding Exner's motive and steps taken to kill the victims, as well as Mrs. Hamilton's testimony about individuals looking for her husband and her husband's gambling problem. Defendant claims that the prohibition of this evidence denied Defendant's rights to due process, a fair trial, and to present a defense. Defendant asserts that he was enti-

tled to present this evidence to show the jury that someone other than Defendant had a motive to kill the victims. Such evidence would have raised the possibility that Mr. Hamilton, and not Dale, was the real target of this crime and would have been relevant motive evidence.

 The State first contends that Defendant's claims of error are not preserved, and thus, may be reviewed only for plain error. We agree. To preserve a claim that evidence was improperly excluded, the proponent of the evidence must attempt to present the evidence at trial, and if an objection is sustained, the proponent must then make an offer of proof. *State v. Chambers,* 234 S.W.3d 501, 511 (Mo.App. E.D.2007). "An offer of proof made before trial at a hearing on a motion in limine will not suffice." *Id., quoting State v. Marshall,* 131 S.W.3d 375, 377 (Mo.App. E.D.2004). "To preserve the matter for appellate review, the offer of proof must be made during trial." *Id.* An offer of proof must be sufficiently specific to inform the trial court of the specifics of the proposed evidence and demonstrate its admissibility. *State v. Childs,* 257 S.W.3d 655, 658 (Mo.App. W.D.2008). The offer preferably is made in question and answer format, and mere statements and conclusions are insufficient. *Id.* An appellate court has discretion on whether to review an unpreserved matter for plain error. *Chambers,* 234 S.W.3d at 511.

 Regarding Defendant's third point related to Exner, Defendant only attempted to introduce evidence when he asked Dale's sister Ellis a question concerning her suspicion of Exner and another man in the murders. Regarding Defendant's fourth point related to Mrs. Hamilton's testimony about her husband's financial problems and the fact that unidentified people had been looking for him, counsel told the trial court only that he would be

presenting testimony from other witnesses about Mr. Hamilton's financial difficulties. Defendant did not specify witnesses or demonstrate the specifics of what testimony the witnesses would provide. Thus, neither offer of proof was sufficient to permit the trial court to consider the evidence's relevancy and admissibility. *Childs*, 257 S.W.3d at 658–59.

In our discretion, we will review Defendant's claims for plain error. A request for plain error review triggers the commencement of a two-step analysis by an appellate court. *State v. Campbell*, 122 S.W.3d 736, 740 (Mo.App. S.D.2004). The first step of this analysis is to determine whether the asserted claim of plain error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has occurred. *Id.* If facially substantial grounds are found to exist, the appellate court should secondly engage in plain error review to determine whether manifest injustice or a miscarriage of justice has actually occurred. *Id.* If facially substantial grounds are not found to exist, however, the appellate court should decline to exercise its discretion to review the claim of plain error pursuant to Rule 30.20. *Id.* To find manifest injustice, this Court must find that the trial court's error in admitting the evidence was outcome determinative. *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006).

Evidence that another person had an opportunity or motive to commit the crime is not admissible just to cast bare suspicion on another person. *State v. Woodworth*, 941 S.W.2d 679, 690 (Mo.App. W.D.1997). Evidence that another person had opportunity or motive to commit the crime with which the defendant is charged is admissible only if there is also proof that the other person committed some act directly connecting him with the crime. *State v. Wise*, 879 S.W.2d 494, 510 (Mo.

banc 1994). "The evidence 'must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person.'" *Woodworth*, 941 S.W.2d at 690, *quoting State v. Donnell*, 862 S.W.2d 445, 450 (Mo.App. W.D.1993).

Regarding Defendant's third point related to Exner, Defendant failed to demonstrate that Ellis could testify to any acts committed by Exner that would directly link him to the murders. Mere evidence of Ellis's suspicion that Exner had the opportunity or motive to commit the crime is by itself inadmissible. *Evans v. State*, 85 S.W.3d 750, 753 (Mo.App. E.D.2002). Additionally, the evidence that Exner had been seen looking for a hitman on the internet would not alone directly connect Exner to the murders that actually occurred. Neither would the evidence have exonerated Defendant, who also had the motive and opportunity to commit the murders. *See Helmig v. State*, 42 S.W.3d 658, 671 (Mo.App. E.D.2001).

Furthermore, evidence related to Mrs. Hamilton's testimony about her husband's financial problems and the fact that unidentified people had been looking for him would have been inadmissible hearsay because it would have relied on the out-of-court statements of the unidentified persons to prove the truth of what they had said to Mrs. Hamilton. *State v. Clark*, 859 S.W.2d 782, 787 (Mo.App. E.D.1993). The testimony also pointed to financial problems but not murder, and thus, the disconnected acts of which Mrs. Hamilton may have testified did not directly link those unidentified persons to the murders. *See State v. Stokes*, 638 S.W.2d 715, 723 (Mo. banc 1982).

Defendant claims that because the proof against Defendant was not overwhelming in this case, the State did not rebut the presumption of prejudice. *See State v.*

*Barriner,* 111 S.W.3d 396, 401 (Mo. banc 2003). Defendant argues that there was no confession, no eyewitnesses to the murders, no physical evidence placing Defendant inside the residence, and only circumstantial evidence. However, we find that the State presented a motive for Defendant to kill his father, direct testimony placing in Defendant's possession the weapon used to murder the two victims, an eyewitness as well as surveillance tapes to show Defendant had delivered and abandoned Dale's vehicle in the casino parking garage, latex gloves in the other vehicle seen with Dale's vehicle at the time it was abandoned, and Defendant's obvious untruthfulness to the police regarding an alibi. Taken together, the evidence against Defendant directly connected Defendant with the commission of the crimes, and no other proffered evidence would have changed the outcome of the trial.

We find that the exclusion of evidence that any of a number of people could have murdered the two victims was not evidence that would directly connect them with the crime and would have served only to confuse the jury. Defendant's asserted claim does not facially establish substantial grounds for believing a manifest injustice or miscarriage of justice has occurred in omitting such evidence. Defendant's third and fourth points are denied.

### Conclusion

The judgment of the trial court is affirmed. Because a clerical mistake was made in the preparation of the judgment, we remand this case to the trial court for a nunc pro tunc order reflecting Defendant's status as a prior offender.

GEORGE W. DRAPER III, and ROY L. RICHTER, JJ., Concur.