

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED109523 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable James E. Sullivan |
| TYRONE BUTLER, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 22, 2022 |

## Introduction

Tyrone Butler ("Butler") appeals from his convictions and sentences following a jury trial on assault in the first degree, armed criminal action, sodomy in the first degree, and kidnapping in the first degree. Butler raises two points on appeal. Butler first argues the trial court abused its discretion in allowing the State to cross-examine him about phone calls he placed from jail suggesting witness interference because the calls were inadmissible evidence of unrelated and uncharged bad acts that were more prejudicial than probative. Butler next argues the trial court abused its discretion in overruling his motion to suppress K.T.'s pretrial and in-court identifications of him because K.T.'s great-aunt created a substantial likelihood of misidentification by suggesting Butler was K.T.'s attacker and showing K.T. photographs of Butler. Because the phone calls from jail tended to show Butler's consciousness of guilt, the trial court did not abuse its discretion by permitting them to be a subject of cross-examination by the State. Point One is denied. Because the police procedures surrounding K.T.'s identification of

Butler were not impermissibly suggestive, the trial court did not abuse its discretion by allowing the identifications into evidence. Point Two is denied. Accordingly, we affirm the trial court's judgment.

### Factual and Procedural History

On January 11, 2017, K.T., a twelve-year-old girl, walked her daily route to the bus stop for school. This route would take her past Butler's home. Butler called K.T. over to him. K.T. was able to get a good look at Butler. K.T. did not know Butler's name, but she knew him as someone she had seen in her neighborhood. Butler instructed K.T. to start walking and directed her through an alley. Nearby surveillance cameras showed Butler approaching K.T. Butler forced K.T. into a vacant house.

Upon reaching the second floor, Butler removed K.T.'s clothes after she refused to do so herself. Butler started "beating" K.T., and then made her "suck his private part[.]" Butler then beat and choked K.T. before cutting her throat with a piece of a broken bottle.

Following the attack, K.T. was missing for approximately two nights. Police officers searched the vacant house and discovered K.T. lying on the floor. The officers found bloody footprints, blood splatter on the walls, and a piece of broken bottle that subsequent testing confirmed had K.T.'s blood on it.

While in the hospital, K.T.'s great-aunt showed K.T. various photos from Facebook and asked if she recognized anyone. The first photo showed Butler among a group of people. K.T. pointed to Butler "right away," saying "that's him." K.T. identified Butler as the person who abducted and assaulted her to her great-aunt. No police officers were present when the photos were shown to K.T. K.T.'s great-aunt was not told by anyone in the police department to show the photos to K.T.

Detective Monzell Scott ("Det. Scott") directed Detective Paul Kosednar ("Det. Kosednar") to prepare a photo lineup to be shown to K.T. Det. Kosednar used the "REJIS criminal justice database" to produce the most recent photo of Butler and photos of other similar individuals for the lineup. Det. Scott reviewed the photo lineup and moved Butler's photo to the fourth position because Butler was originally in the first position, which "[Det. Scott] generally [does not] like doing because it kind of . . . taints it."

Detectives Kosednar and Jason Steurer ("Det. Steurer") presented the photo lineup identification to K.T. at her home. Det. Steurer administered the lineup. Det. Steurer had "never heard of [Butler] before" and was "unaware of what photograph belonged to what individual." Det. Kosednar stayed by the doorway, so that he would not be "involved in somehow biasing [K.T.] in her viewing of the lineup." Det. Scott was not present for the photo lineup. Upon seeing Butler's photo, K.T. became nervous and emotional. Det. Steurer could "tell that there was a definite reaction and she recognized [Butler]." Even though K.T. identified Butler as her attacker, Det. Steurer told her to "keep looking at the other photos." After looking at all the photos, K.T. still identified Butler and indicated that she was certain she identified the correct suspect.

Detectives Scott and Steurer brought Butler to the police station and questioned him. Butler admitted to seeing and speaking with K.T. the day she was abducted, but denied doing anything to her. Butler then started discussing in detail the route that K.T. took to her bus stop every day. Butler eventually admitted that he went to the vacant house with K.T., that he forced her to perform oral sex on him, and that he cut her throat with the broken piece of the glass bottle. The State charged Butler with various counts of assault, armed criminal action, sodomy, and kidnapping.

3

Det. Steurer then prepared a live lineup consisting of Butler and three other individuals. Det. Steurer was not in the room with K.T. during the physical lineup, but Det. Scott was present. After giving her the proper instructions, Det. Scott did not speak to K.T. during the lineup. Each individual was brought into the room by himself for a few moments. K.T. again identified Butler and indicated that she had identified him and that she was "certain" of her identification.

While awaiting trial, Butler made several phone calls from jail relevant to this appeal, including a call to his friend Kevin Gates ("Gates") and calls to his sister and brother. After discussing a feud with another inmate with Gates, Butler told Gates that he needed "a favor." Butler said, "I can't say the real thing, . . . but me and you being hood, you should already know what I'm saying." Butler then told Gates that he needed him to "take some m*********ers out to eat" by his court date. Butler confirmed that Gates knew "where they live at" and asked when the next time Gates would visit Butler's mother's house, which was near K.T.'s home. Butler then called his sister and reiterated to her that Gates needed "to take m*********ers out to eat."

At trial, Butler testified in his own defense and denied committing any of the offenses with which he was charged. The State sought to cross-examine Butler about his phone calls from jail arguing that the phone calls were evidence of his intent to commit witness interference. The State asserted that Butler's request that Gates take "[them] out to eat" was code for putting a hit out on K.T. Butler objected to the State's questioning about the phone calls as inadmissible prior bad-act evidence. Butler argued that while any comments of taking "[them] out to eat" may have been Butler wanting Gates to undertake a potentially violent act, those comments related only to street violence between Butler and another inmate, and not any witness to the offenses with which Butler was charged. Butler further claimed his court date was mentioned in

4

the phone call not because of the need to have any witness taken care of before then, but because if he was released that day he could have been in danger due to the feud with the other inmate. The trial court ruled that the State could question Butler about the jailhouse phone calls, finding said calls were evidence of Butler's requests that someone harm a witness in the case, and were therefore admissible as consciousness of guilt.

During the State's questioning, Butler admitted to making the statements in the phone calls from jail, including asking Gates and his brother to "take [them] out to eat" and telling his sister that Gates needed to "take [them] out to eat." Butler testified that taking someone "out to eat" involved "trouble," specifically having someone beaten, shot, or killed.

Butler called expert witness James Lampinen ("Lampinen"), a psychology professor from the University of Arkansas, to testify regarding K.T.'s identification of Butler. Lampinen reviewed police reports, depositions, an interview with K.T., and photographs from the lineups. Lampinen testified regarding the photographic lineup that "all the boxes you would check off for conducting a proper identification were conducted in that case. The photographic lineup I think was a very well-done professional lineup." Lampinen further testified that the live, in-person lineup was not a "perfect lineup," but it "wasn't terribly suggestive[.]"

Butler was convicted on two counts of assault in the first degree, one count of armed criminal action, one count of sodomy in the first degree, and one count of kidnapping in the first degree. Butler filed a motion for new trial, claiming the trial court erred in admitting evidence of Butler's phone calls from jail and in denying the motion to suppress K.T.'s identification of Butler. The motion for new trial was denied by operation of law after ninety days. See Rule 29.11(g).[1] The trial court then sentenced Butler to life in prison on each assault conviction and

---

[1] Rule references are to Mo. R. Crim. P. (2020).

ten years for armed criminal action, sodomy, and kidnapping, with the sentences to run consecutively. This appeal follows.

## Points on Appeal

Butler raises two points on appeal. In Point One, Butler contends the trial court abused its discretion by allowing the State to cross-examine him about the phone calls he placed from jail while awaiting trial because the calls were evidence of uncharged bad acts that were irrelevant to the charged crimes and were more prejudicial than probative. In Point Two, Butler argues the trial court abused its discretion in overruling his motion to suppress K.T.'s pretrial and in-court identifications because K.T.'s great-aunt suggested Butler was her attacker by showing photographs of Butler to K.T. prior to the police line-ups. Butler contends the great-aunt's actions were so impermissibly suggestive as to create a substantial likelihood of misidentification and to render K.T.'s subsequent identifications of Butler unreliable.

## Standard of Review

"The circuit court has broad discretion in admitting evidence at trial, and error will be found only for a clear abuse of this discretion." State v. Brandolese, 601 S.W.3d 519, 533 (Mo. banc 2020) (citing State v. Simmons, 955 S.W.2d 729, 737 (Mo. banc 1997)). We find the trial court abuses its discretion where its ruling is "clearly against the logic and circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id. (citing State v. Brown, 939 S.W.2d 882, 883-84 (Mo. banc 1997)). "[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Id. We "review[] the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." Id. at 533–34 (quoting State v. Zink, 181 S.W.3d 66, 73

6

(Mo. banc 2005)).  "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial."  Id.

Discussion

**Point One—Cross-Examination on Butler's Phone Calls from Jail**

Butler challenges the trial court's ruling allowing the State to cross-examine him about his phone calls from jail by characterizing the phone calls as inadmissible evidence of irrelevant, uncharged bad acts that were more prejudicial than probative in nature.

Evidence of uncharged offenses or acts is generally inadmissible to show the propensity of the defendant to commit such offenses.  State v. Speaks, 298 S.W.3d 70, 83 (Mo. App. E.D. 2009) (citing State v. Barton, 998 S.W.2d 19, 28 (Mo. banc 1999)).  However, evidence of uncharged acts is admissible when the evidence is logically and legally relevant to establishing the defendant's guilt as to the charged offense.  Id. at 83–84.  Logically relevant evidence has a "legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial[.]"  Id. at 84 (internal citation omitted).  The test for logical relevancy is a "very low-level test that is easily met."  State v. Thomas, 628 S.W.3d 686, 691 (Mo. App. E.D. 2021) (internal citation omitted).  "[L]ogically relevant evidence is admissible only if legally relevant."  Id. (internal quotation omitted).  Legally relevant evidence is that which has more probative value than prejudicial effect.  Speaks, 298 S.W.3d at 84 (internal citation omitted).

Missouri courts recognize several well-known exceptions that satisfy the test for logical and legal relevance and permit the admission of uncharged-bad-acts evidence.  Id. (internal citation omitted).  Critical to this case, "[c]onduct and declarations of a defendant that are relevant to show consciousness of guilt or a desire to conceal the offense are admissible because they tend to establish the defendant's guilt of the charged crime."  Id. (citing State v. Davidson, 242 S.W.3d 409, 415 (Mo. App. E.D. 2007)); see also State v. Naylor, 510 S.W.3d

7

855, 860 (Mo. banc 2017) (internal citation omitted). Particularly relevant to this appeal, "[E]vidence that the defendant threatened a witness is admissible to show consciousness of guilt." Speaks, 298 S.W.3d at 84.

Here, Butler maintains that the phone calls at issue constituted inadmissible evidence of uncharged bad acts because the phone calls related not to the charged offenses or K.T., but to a separate ongoing feud Butler was having with another inmate. Butler suggests that his explanation regarding his feud with another inmate was the only logical conclusion that could be drawn from the context of the phone calls, thus the trial court abused its discretion in permitting the State to question him about the calls. We disagree.

The record contains ample evidence suggesting that Butler's comments in the phone calls to "take [them] out to eat" were an attempt to intimidate, harm, or possibly kill a witness in this case. Butler acknowledges that his use of that phrase meant "trouble," specifically having someone beaten, shot, or killed. While the person Butler wanted taken "out to eat" is not specifically named, evidence in the record supports a reasonable inference that the unnamed target of Butler's request was a witness to Butler's charged offenses. See Speaks, 298 S.W.3d at 84. Notably, Butler emphasized multiple times that he needed someone taken "out to eat" by his court date for the charged crimes. Butler also asked Gates when he would visit Butler's mother's house, which was near K.T.'s home, and had Gates confirm that Gates knew "where they live at." The trial court was apprised of the State's theory that Butler was attempting to conceal evidence of his charged offenses against K.T. by asking Gates to take her "out to eat" before his court date. Given the record before us, we are persuaded that the trial court properly applied the test for logical and legal relevance in concluding that the jailhouse phone calls were admissible as probative of Butler's consciousness of guilt for the charged offenses because the statements

8

reasonably can be interpreted as threatening harm to a witness in Butler's case. See id. at 84. Even assuming the existence of evidence to support Butler's claim that the jailhouse threats were directed to matters wholly unrelated to the offenses for which Butler was charged, because reasonable persons could differ as to the intended target of Butler's threats, the trial court did not err in admitting the phone calls as evidence of Butler's consciousness of guilt for the offenses with which he was charged. See Brandolese, 601 S.W.3d at 533. Indeed, the trial court's rejection of Butler's argument that he was trying to have someone *other* than K.T. harmed or killed before trial was not arbitrary or unreasonable. See id.

The trial court's finding that the jailhouse phone calls evidenced Butler's consciousness of guilt was not clearly against the logic and circumstances before it. See id. Therefore, we find no abuse of discretion. See id. Point One is denied.

**Point Two—Identification Evidence**

Butler next argues that the trial court abused its discretion in overruling his motion to suppress K.T.'s pretrial and in-court identifications. Butler specifically challenges the admissibility of said identifications because K.T.'s great-aunt's involvement in the identification process was impermissibly suggestive, created a substantial likelihood of misidentification, and rendered the subsequent identifications unreliable.

"In reviewing the trial court's denial of a motion to suppress, we consider the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." State v. Gordon, 551 S.W.3d 678, 682 (Mo. App. W.D. 2018) (citing State v. Green, 469 S.W.3d 881, 883 (Mo. App. E.D. 2015)). All facts and inferences are viewed in the light most favorable to the trial court's ruling, and we disregard all contrary inferences. Id.

We use a two-pronged inquiry to determine whether identification testimony is admissible. Id. (internal citation omitted). "First, [we] determine[] *whether the police procedures used* were impermissibly suggestive." Id. (internal citation omitted) (emphasis added). "Police procedures are impermissibly 'suggestive if the witness's identification of the defendant results from the procedure or actions of the police rather than from the witness's recollections[.]'" Id. (internal citation omitted). The first step focuses "solely on the actions of the police" in administering the pretrial procedures for identification. State v. Edwards, 530 S.W.3d 593, 599 (Mo. App. E.D. 2017) (citing State v. Mullins, 340 S.W.3d 311, 314 (Mo. App. E.D. 2011)). Only if the procedures utilized by the police are found to be impermissibly suggestive, do we then consider whether the identification testimony is unreliable as a result. Gordon, 551 S.W.3d at 682. If the pretrial identification procedures are determined not to be unreasonably suggestive, the court need not review the reliability prong. Id.; Edwards, 530 S.W.3d at 599.

Here, Butler claims that the pretrial and in-court identifications made by K.T. were "tainted" because K.T.'s great-aunt showed her pictures of Butler prior to any police identification procedures. Butler reasons that this conduct was unduly suggestive and created a substantial likelihood that K.T.'s subsequent identifications were unreliable. Regardless of the potential taint to K.T.'s subsequent identification of Butler as her attacker, Butler's challenge to the admissibility of K.T.'s subsequent identification of Butler is unavailing because Butler has *not placed at issue any conduct of the police*. The record lacks any evidence to suggest that the police engaged in impermissibly suggestive procedures. Our analysis of admissibility of the identification evidence must focus "*solely on the actions of the police.*" Edwards, 530 S.W.3d at 599 (citing Mullins, 340 S.W.3d at 314). Here, the only alleged impermissibly suggestive

10

actions were taken by the victim's great-aunt. The record contains evidence that while K.T. was recovering in the hospital, her great-aunt showed her pictures from Facebook depicting Butler with others and alone, and K.T. recognized him as her attacker. The record lacks any evidence that K.T.'s great-aunt was instructed or influenced by the police to show Butler's photographs to K.T. nor does Butler make any such allegation. Importantly, the two-pronged test *for admissibility* of identification evidence does not extend to non-police conduct. See id. Butler does not point to any actions or procedures conducted *by the police* that were impermissibly suggestive. To the contrary, Butler's own expert witness described the police-administered photo lineup as a "very well-done professional [photographic] lineup" and that while the police-administered in-person lineup was "not perfect," "it wasn't terribly suggestive." Because Butler has failed to show that the pretrial police procedures for identification were impermissibly suggestive, we do not reach the reliability of the identifications. Gordon, 551 S.W.3d at 682; Edwards, 530 S.W.3d at 599.

We recognize Butler's concerns with regard to Missouri's framework for identification testimony and its application to this case, but we are constrained by the nature of his claim and the clear two-pronged test that must be satisfied. See Gordon, 551 S.W.3d at 682. Absent a nexus of *police* actions with suggestiveness, we must deny the claim that the State's identification procedures were improper. See Edwards, 530 S.W.3d at 599. Butler, however, was not without recourse as to the potential bias created by great-aunt's conduct. "Reliability, credibility, and the weight afforded to witness testimony are all for the fact-finder to determine." State v. Hankins, 531 S.W.3d 77, 80 (Mo. App. S.D. 2017) (citing State v. Cannafax, 344 S.W.3d 279, 284 (Mo. App. S.D. 2011)). Butler was entitled to cross-examine witnesses and argue to the jury that K.T.'s identification of Butler as her attacker resulted from

11

the suggestiveness of great-aunt's actions of showing K.T. photos of Butler while K.T. was hospitalized. The issue presented by the great-aunt's actions relates to the credibility of K.T.'s identification and not the admissibility of the identification. What weight should be given to K.T.'s identifications of Butler is left solely for the jury to determine. Id.

Accordingly, the trial court did not abuse its discretion in admitting K.T.'s identifications into the record. See Brandolese, 601 S.W.3d at 533. Point Two is denied.

Conclusion

The judgment of the trial court is affirmed.

_____

KURT S. ODENWALD, Presiding Judge

Kelly C. Broniec, J., concurs.
Thomas C. Clark II, J., concurs.

12